No. 97-408

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 72


STEVE QUIGLEY and JULIE QUIGLEY,

Plaintiffs, Respondents, and Cross-Appellants,

v.

JOHN ACKER and ELIZABETH ACKER,

Defendants, Appellants, and Cross-Respondents.



APPEAL FROM:    District Court of the Sixth Judicial District,
In and for the County of Park,
The Honorable Wm. Nels Swandal, Judge presiding.



COUNSEL OF RECORD:

For Appellant:

Karl Knuchel, Livingston, Montana

For Respondent:

Tom W. Stonecipher, Harris, Tarlow & Stonecipher, Bozeman,
Montana



Submitted on Briefs: November 20, 1997

Decided:  April 2, 1998
Filed:


_____
Clerk

Justice William E. Hunt, Sr., delivered the Opinion of the Court.

¶1    Steve and Julie Quigley (the Quigleys) contracted with John and Elizabeth Acker (the Ackers) for the purchase of land owned by the Ackers. The Quigleys defaulted on their payment obligation, and were unable to pay the accelerated balance of the purchase price on time.  The Ackers then sought to terminate the contract and impose a forfeiture.  The Quigleys brought this action to obtain a declaration that the Ackers' notices of default and termination were defective; to obtain relief from forfeiture; and to obtain attorney fees and costs of suit.  The Sixth Judicial District Court, Park County, entered judgment in favor of the Quigleys on the issues of defective notices and relief from forfeiture, but held that each party was responsible for their own attorney fees and costs.  From that judgment, the Ackers appeal on the issues of defective notice and relief from forfeiture, and the Quigleys cross-appeal on the issue of attorney fees and costs.  We affirm in part and reverse in part.

¶2    We address the following issues on appeal:

¶3    1.    Did the District Court err in finding and concluding that the Ackers' Default and Termination Notices were defective?

¶4    2.  Did the District Court err in concluding that the Quigleys were entitled to relief from forfeiture under § 28-1-104, MCA?

¶5    3.  Did the District Court err in ordering the parties to pay their own attorney fees and costs?

¶6    4.  Are the Quigleys entitled to attorney fees and costs on appeal?
                              BACKGROUND

¶7    This action involves the interpretation and resolution of a contract for sale of land described as Section 19, Township 4 North, Range 10 East, M.P.M., Park County, Montana (Section 19).  The original parties to this contract were the Ackers as sellers and Robert and Jeannette Baldwin (the Baldwins) as buyers.  On August 15, 1988, the Ackers agreed to sell to the Baldwins Section 19 and Section 29 of Township 4 North, Range 10 East for $450,000.  Between 1988 and 1991, the Baldwins' right to purchase Section 19 was assigned to several different successors.

¶8    On November 15, 1991, the Quigleys agreed to buy Section 19, and an additional 640 acres different from that of Section 29, from Gary and Audrey Swenson (the Swensons) and Wilderness Images Ltd. Profit Sharing Plan (Wilderness Images).  The Quigleys agreed to pay $706,932.07 for the two tracts of land and assume the obligations of buyer under the original Acker/Baldwin contract for Section 19.  At the time of Quigleys' purchase, the principal balance remaining on the Acker/Baldwin contract was $131,432.07

with an interest rate of 9%. Starting in November 1991, pursuant to the terms of the contract, the Quigleys made payments of $2185.22 on the fifteenth of each month to the parties' escrow agent, Citizens Bank and Trust of Big Timber, Montana. Also, pursuant to the terms of the contract, the Quigleys paid the real property taxes assessed on the property.

¶9   In 1994, the Quigleys decided to sell their California construction company and use the proceeds to prepay the balance due under the contract with the Swensons and Wilderness Images. The Swensons and Wilderness Images agreed to the prepayment, but only to the extent of principal excluding the balance owed on the Acker/Baldwin contract. The Acker/Baldwin contract provided that prepayment could be made only upon written consent of the Ackers. The Quigleys requested the Ackers' consent to prepay, but the Ackers refused for tax reasons.

¶10  The Quigleys continued to meet their obligations under the contract to the Ackers until August 1996 when they missed a payment. At the time of default, the Quigleys had paid $657,204.07 of the $706,932.07 principal due under their contract with the Swensons and Wilderness Images. The difference of $49,728 reflected the balance of the principal owing on the Acker/Baldwin contract. The Quigleys had also spent more than $20,000 in labor, improvements, and maintenance of the house and shop building located on Section 19.

¶11  Several adverse events contributed to the Quigleys' default. First, after sale of the California construction company, the Quigleys were unable to collect the estimated $200,000 in accounts receivable. This was due in part to clients unwilling or unable to pay their bills, and to inexperienced administrative personnel attempting to wind up the affairs of the company. Second, in October 1993, the Quigleys started a new construction company in Wilsall, Montana. The Montana company experienced unanticipated problems with cash flow, and again the Quigleys had trouble collecting amounts owed them by their customers. One customer owed the Quigleys more than $50,000. Third, on September 9, 1996, a judgment in the amount of $125,000 was filed against the Quigleys and their California construction company as the result of a lawsuit filed by the carpenters' union. Lastly, In October 1996, the Internal Revenue Service filed a tax lien in the amount of $126,230 against the Quigleys. The tax lien involved a dispute over business related deductions taken by the Quigleys on earlier tax returns with the advice of their accountant.

¶12  On September 17, 1996, the Quigleys made their August 1996 payment to the escrow agent. On September 21, 1996, the Quigleys received a Notice of Default for Contract for Deed (Default Notice), but the Quigleys' check did not accompany the Default Notice. Upon the direction of the Ackers, the escrow agent held the check. The Default Notice informed the Quigleys that they had defaulted on their August and September payments, and that to cure the default, the Quigleys were to pay $4370.44 of the principal, $782.18 in unpaid taxes, $100.00 in attorney fees, and interest and penalties, within thirty days. However, the Default Notice failed to specify the amount of interest and penalties due and the place where payment was to be made as required by the Acker/Baldwin contract. The Default Notice stated that if the default was not

cured within thirty days, the contract for deed would be terminated and forfeiture would be imposed.

¶13 For the same reasons stated above, the Quigleys were unable to cure the default on time. On November 2, 1996, the Quigleys received a Notice of Termination of Contract for Deed (Termination Notice). The Termination Notice informed the Quigleys that no payments had been received by the escrow agent, and that the Ackers had elected to accelerate the entire balance due on the contract plus 9% interest per annum computed from July 25, 1996. The Termination Notice stated that to prevent termination of the contract and forfeiture, the Quigleys must pay the accelerated principal balance of $49,728.00, $782.18 in unpaid taxes, $200.00 in attorney fees, and interest and penalties, within thirty days. Again, the Termination Notice failed to specify the amount of interest and penalties due and the place where payment was to be made. Also, the Acker/Baldwin contract provided a sixty-day period in which a buyer could pay the accelerated balance and prevent termination of the contract. Realizing the error of the notice period, the Ackers sent the Quigleys an amended Termination Notice on November 12, 1996, allowing sixty days, until January 11, 1997, to pay the required sums and prevent termination and forfeiture. This amended Termination Notice was not signed by or on behalf of the Ackers. Meanwhile, on November 6, 1996, the Ackers had returned the Quigleys' check to them.

¶14 The Quigleys attempted to obtain sufficient funds to pay the amounts demanded by the Ackers but were unsuccessful. The Quigleys inquired about the possibility of a loan from both a California bank and a Montana bank but the banks told the Quigleys they would not qualify. The Quigleys' request to receive advance payments from the buyer of their California construction business was also unsuccessful. The Quigleys then attempted to sell Section 19 to an adjacent landowner, Sherry Nicholas. On December 13, 1996, Ms. Nicholas signed a nonbinding preliminary agreement to buy Section 19 for $930,000. However, the Quigleys did not expect to close this sale before the January 11, 1997 termination deadline. On January 9, 1997, the Quigleys approached the Ackers and offered to pay more money in exchange for an extension of time in which to complete the sale of Section 19 to Ms. Nicholas, and pay the Ackers the amounts due under the Acker/Baldwin contract. Mr. Acker responded that he would talk to Ms. Acker and would have an answer to the Quigleys by the next morning. Mr. Acker never responded to the Quigleys' request.

¶15 On January 14, 1997, the Ackers terminated the Acker/Baldwin contract and directed the escrow agent to release a reconveyance deed to Section 19. That same day, the Ackers took title to Section 19 and attempted to cause the forfeiture of all of the Quigleys' rights under the Acker/Baldwin contract.

¶16 On February 4, 1997, the Quigleys attempted to resolve the matter by sending a letter and a cashier's check for $54,263.11 to the Ackers. The letter stated that the check was being tendered pursuant to § 28-1-104, MCA, Montana's anti-forfeiture statute, and that the Quigleys' failure to make the August and September payments on time did not result from any grossly

negligent, willful, or fraudulent breach of duty.  The letter further indicated that the amount tendered represented the $49,728.00 accelerated balance due on the Acker/Baldwin contract; $2,378.44 in interest calculated at 9% from July 25, 1996 to February 4, 1997; $1946.67 in unpaid taxes; and $200.00 in attorney fees.  The Ackers held the check until February 27, 1997, when it was returned to the Quigleys.

¶17  The Quigleys filed a complaint in District Court seeking relief from the Ackers' attempt to terminate the Acker/Baldwin contract and impose a forfeiture.  The Quigleys argued that first, the Ackers failed to follow the default and termination procedures provided in the contract, and second, the Quigleys were entitled to relief from forfeiture pursuant to § 28-1-104, MCA.  A bench trial was held on April 25, 1997.  On May 28, 1997, the District Court entered its Findings of Fact, Conclusions of Law, and Order in favor of the Quigleys.  The District Court made the following findings of fact:

10.  From November 1991 to August 1996, the Quigleys paid a total of $657,204.07 of the principal balance of $706,932.07 originally due under the contract for deed with the Swensons.  During this period, the Quigleys paid the Ackers $82,204.07 of principal [$131,432.07] due pursuant to the Acker/Baldwin contract, plus 9% interest. . . . [T]he Quigleys spent over $20,000 in labor, improvements, and maintenance of the house and shop building located on Section 19.

11.  In 1994, the Quigleys attempted to pre-pay the balance due under the contract  The Ackers did not agree to the pre-payment because of tax considerations.

21.  The Quigleys' failure to pay the sums due was not the result of gross, negligent, willful or fraudulent breach of duty.  The Quigleys suffered a series of financial set-backs beyond their control.  These included a judgment filed in favor of a carpenter's union for over $125,000 and an IRS tax lien filed in the amount of $126,230.  The latter involved a dispute over deductions taken with the advice of the Quigleys' accountant.  These two liens made it very difficult to obtain a loan from a financial institution to pay the default.

22.  Further, the Quigleys left a lucrative construction business in California and started one in Montana in 1993 called Quigley Construction.  The Montana business has been slow to grow and has experienced severe cash flow problems.  However, had some of the business' customers paid their bills, the Quigleys would have been in a position to make the required payments under the contract.

23.  Beginning in the fall of 1996, the Quigleys attempted to sell Section 19 in order to raise money sufficient to pay the Ackers the amounts demanded in the Termination Notice . . . .  The sale could not be completed because of disputes in the language of the contract, but the selling price for the property

was set at $930,000.

25.  The application of a forfeiture of the Acker/Quigley
[Acker/Baldwin] contract would result in a windfall to the
Ackers, for they have received, and would keep, over $300,000
in principal payments (plus interest) while retaining Section 19.
The Quigleys would have paid the Ackers over $82,000, plus
interest, and would receive nothing.  The Ackers lose nothing by
accepting the money due under the contract, but would receive
a windfall if the forfeiture were allowed to stand.  Application
of a forfeiture in these circumstances would be harsh and
inequitable.

On the basis of these findings, the District Court made the following
conclusions of law:

4.  The Quigleys were unable to make payments due on the
Acker/Baldwin contract . . . due to temporary cash flow
shortages resulting from legitimate and unexpected business
problems.  In the face of these shortages, the Quigleys acted
reasonably to raise money to pay off the contract and also
attempted to sell Section 19.  These efforts were reasonable
under the circumstances, and the Quigleys have established that
they are equitably entitled to the relief they seek because their
failure to pay amounts demanded by the Ackers was not the
result of a grossly negligent, willful, or fraudulent breach of
duty.

5.  The Quigleys are entitled pursuant to Section 28-1-104,
MCA,  to relief from the forfeiture of their rights under the
Acker/Baldwin contract upon their re-tender to the Ackers of the
$54,253.11 tendered to them earlier.

The District Court also ordered that the parties bear their own attorney fees
and costs.  On June 19, 1997, the Ackers filed a notice of appeal on the issues
of defective notices and relief from forfeiture, and on June 24, 1997, the
Quigleys filed a cross-appeal on the issue of attorney fees and costs.

STANDARD OF REVIEW

¶18  Regarding the standard of review for the first and third issues, this
Court will not overturn a district court's findings of fact unless those findings
are clearly erroneous.  Rule 52, M.R.Civ.P.; Daines v. Knight (1995), 269
Mont. 320, 324, 888 P.2d 904, 906.  A finding of fact is clearly erroneous if
it is not supported by substantial evidence, if the trial court misapprehended
the effect of the evidence, or if this Court is left with a definite and firm
conviction that the district court made a mistake.  Daines, 888 P.2d at 906.  In
determining whether a finding of fact is clearly erroneous, "due regard shall
be given to the opportunity of the trial court to judge of the credibility of the
witnesses."  Rule 52(a), M.R.Civ.P.  We review a district court's conclusions
of law to determine whether the court's interpretation of law is correct.
Carbon County v. Union Reserve Coal Co. (1995), 271 Mont. 459, 469, 898

P.2d 680, 686.

¶19   The second issue concerning relief from forfeiture is equitable in nature and, therefore, requires a more deferential standard of review.  In equity cases, we apply the standard of review set forth in § 3-2-204(5), MCA.  Glacier Park Co. v. Mountain, Inc. (1997),  54 St. Rep.1222, 1225,      Mont.    , 949 P.2d 229, 233.  Under   3-2-204(5), MCA, we have a duty to determine all of the issues of the case and to do complete justice.  Glacier Park, 54 St. Rep. at 1225, 949 P.2d at 233 (citations omitted).

                              DISCUSSION
                               Issue 1

¶20   Did the District Court err in finding and concluding that the Ackers' Default and Termination Notices were defective?

¶21   The Acker/Baldwin contract provides the following with regard to default and termination procedures:
> In case of the failure of the purchasers to make any payments of principal or interest, . . . the sellers at their election may declare this contract in default by sending written notice to the purchasers and the escrow agent, setting forth the amount due upon the contract, time and place where payment can be made, and any breach or breaches.  Should such default remain uncured for more than thirty (30) days after written notice to purchasers, the sellers may at their option, by an additional written notice to purchasers and escrow agent, accelerate the entire outstanding balance, together with accrued interest immediately due and payable, and upon nonpayment after sixty (60) days, sellers may terminate and forfeit this agreement without further notice.  (Emphasis supplied.)

The Ackers argue that their Default and Termination Notices complied with the above provisions in that they "clearly set forth the amount owed and how to cure the defaults."  We disagree.

¶22   The Ackers' Default and Termination Notices did not comply with the procedures outlined in the above provision.  We have held:
> [T]here must be strict pursuance of the course prescribed by the contract in foreclosing the vendee's rights thereunder, particularly when it involves a forfeiture of the payments made by the vendee, including a reasonably correct statement in the notice of the amount due and required to be paid to avoid forfeiture.

Shuey v. Hamilton (1963), 142 Mont. 83, 91, 381 P.2d 482, 486 (citing Rader v. Taylor (1958), 134 Mont. 419, 427, 333 P.2d 480, 486).  The Ackers' Default and Termination Notices failed to specify two key items required by the terms of the Acker/Baldwin contract: the amount of interest and penalties due on the contract, and the place where payment was to be made. Additionally, the amended Termination Notice was not signed by or on behalf of the Ackers.  By not including these missing items in their Default and

Termination Notices, the Ackers did not strictly pursue the course and procedures for default and termination prescribed by the Acker/Baldwin contract.

¶23   In addition to being facially defective, the notices were defective because they were based on an erroneous assessment that the Quigleys were in default at the time the Default and Termination Notices were sent.  Section 30-3-310, MCA codifies Section 3-310 of the Uniform Commercial Code (U.C.C.) and provides:

> Effect of instrument on obligation for which taken.  (1) Unless otherwise agreed, if a certified check, cashier's check, or teller's check is taken for an obligation, the obligation is discharged to the same extent discharge would result if an amount of money equal to the amount of the instrument were taken in payment of the obligation.  Discharge of the obligation does not affect any liability that the obligor may have as an indorser of the instrument.
> (2)  Unless otherwise agreed and except as provided in subsection (1), if a note or an uncertified check is taken for an obligation, the obligation is suspended to the same extent the obligation would be discharged if an amount of money equal to the amount of the instrument were taken.
> (3)  In the case of an uncertified check, suspension of the obligation continues until dishonor of the note or until it is paid or certified.  Payment or certification of the check results in discharge of the obligation to the extent of the amount of the check.

¶24   Although the courts of Montana have not had occasion to interpret § 30-3-310, MCA, other jurisdictions have interpreted the identical Section 3-310, U.C.C., and have applied it to facts similar to those in the instant case. In Grumet v. Bristol (N.H. 1984), 484 A.2d 1099, a buyer of real estate gave the seller a mortgage to secure a note for a portion of the purchase price.  The note provided that the buyer was to make monthly payments on the fifteenth of each month, and that a default for a period of one month would entitle the seller to accelerate the entire balance of the note.  The buyer did not make his December 1982 payment on time.  On January 13, 1983, the buyer sent the seller a postdated check for the previous month's payment.  The seller received the check and held it for one week.  On January 20, 1983, the seller deposited the check.  However, on the same day, the seller sent the buyer a notice of mortgagee's foreclosure sale and informed the buyer that the entire balance of the note had been called due.  The buyer then petitioned for an injunction against foreclosure.

¶25   Upon these facts, the New Hampshire Supreme Court applied Section 3-310, U.C.C. (then Section 3-802, U.C.C., now repealed) and granted the injunction against foreclosure.  The court held:

> The retention of the check . . . was a taking for an underlying obligation within the meaning of the statute . . . .  Consequently, by January 20, the underlying obligation to pay the December

installment had been suspended, pending presentment of the check. Since the obligation was suspended, there was, by definition, no default on the obligation during the period of suspension. In the absence of default, the defendant [seller] had no right to make a further demand and to elect to accelerate. In summary, the defendant [seller] purported to act on the basis of a default during the very time that his right to claim the default was suspended. As a matter of law, therefore, his purported election to accelerate had no legal effect.

Grumet, 484 A.2d at 1101 (citations omitted).

¶26 We find Grumet persuasive in resolving the instant case. The following facts are undisputed: (1) prior to September 17, 1996, the Quigleys were in default on the Acker/Baldwin contract; (2) on September 17, 1996, the Quigleys tendered a personal, uncertified check for the previous month's payment to the escrow agent; (3) the escrow agent received the check; (4) the Ackers instructed the escrow agent to hold the check; (5) on September 21, 1996, the Quigleys received a Default Notice; (6) the Quigleys did not cure the default; (7) on November 2, 1996, the Quigleys received a Termination Notice informing them that the entire balance on the Acker/Baldwin contract had been accelerated; and (8) on November 6, 1996, the Ackers returned the Quigleys' personal check to them.

¶27 Like the court in Grumet, we determine that the Ackers' retention of the Quigleys' personal, uncertified check was a taking for an underlying obligation and suspended that obligation. Section 30-3-310(2), MCA. This suspension lasted until November 6, 1996, when the Ackers dishonored the Quigleys' check and returned it to them. Section 30-3-310(3), MCA. Because the obligation was suspended, there was, by definition, no default on the obligation during the period of suspension. Consequently, the Ackers' Default and Termination Notices were based on an erroneous assessment of default and had no legal effect.

¶28 We hold that the District Court's finding that the Ackers' Default and Termination Notices were defective was supported by substantial evidence and, therefore, was not clearly erroneous. Further, we hold that the District Court's conclusion that the Ackers' Default and Termination Notices were defective was a correct interpretation of the law.

                         Issue 2

¶29 Did the District Court err in concluding that the Quigleys were entitled to relief from forfeiture under § 28-1-104, MCA?

¶30 The Ackers next argue that the District Court should have denied the Quigleys relief from forfeiture. The Ackers rely on Aveco Properties, Inc. v. Nicholson (1987), 229 Mont. 417, 421-22, 747 P.2d 1358, 1360-61, and cases cited therein, for the assertion that contracts for deed are distinct from trust indentures and mortgages in that contracts for deed do not allow redemptive rights for a party in default. The Ackers contend that in relieving the Quigleys from forfeiture, the District Court rewrote the Acker/Baldwin contract by

inserting redemptive rights. The Ackers argue that the District Court erred in looking beyond the four corners of the Acker/Baldwin contract and creating a remedy for the Quigleys that was never contemplated by the parties.

¶31 The Ackers' reliance on Aveco is misplaced. This Court has long recognized that equity abhors forfeitures. Yellowstone Co. v. Wight (1943), 115 Mont. 411, 418, 145 P.2d 516, 518. Montana's anti-forfeiture statute, § 28-1-104, MCA, reflects this policy and authorizes a district court to relieve a party from forfeiture "in any case where he sets forth facts which appeal to the conscience of a court of equity." Parrott v. Heller (1976), 171 Mont. 212, 214, 557 P.2d 819, 820 (citations omitted). Specifically, § 28-1-104, MCA, provides:

> Relief from forfeiture. Whenever by the terms of an obligation a party thereto incurs a forfeiture or a loss in the nature of a forfeiture by reason of his failure to comply with its provisions, he may be relieved therefrom upon making full compensation to the other party, except in case of a grossly negligent, wilful, or fraudulent breach of duty.

In interpreting § 28-1-104, MCA, we have stated:

> [Section 28-1-104, MCA] was enacted for the benefit of obligors whose failure to punctually perform would result in loss to them in the matters in respect to which they have contracted. . . . The intention of the law under this statute is that a forfeiture should not be needlessly enforced.

Yellowstone Co., 115 Mont. at 417-18, 145 P.2d at 518.

¶32 Thus, although Aveco correctly states the law regarding interpretation of contractual obligations, it is not controlling in this case because ¶ 28-1-104, MCA, clearly authorizes a court to relieve a party from forfeiture when the interests of fairness and equity so require. Simply put, "even though the parties agreed that forfeiture would result from [Quigleys'] default, this Court may, under appropriate circumstances, still grant equitable relief." Glacier Park, 54 St. Rep. at 1225, 949 P.2d at 233.

¶33 The Ackers argue that even if this Court determines, as we have, that § 28-1-104, MCA, is applicable, the District Court still erred in granting the Quigleys relief from forfeiture because the Quigleys did not meet all the requirements of § 28-1-104, MCA. A party qualifies for relief from forfeiture under § 28-1-104, MCA, if he has tendered full compensation for his obligation; his default under the contract was not the result of a grossly negligent, willful, or fraudulent breach of duty; and he asserts facts which appeal to the conscience of the court of equity. Glacier Park, 54 St. Rep. at 1225, 949 P.2d at 234.

¶34 It is undisputed that the Quigleys tendered full compensation for their obligation. The letter that accompanied the Quigleys' $54,253.11 cashier's check stated that the amount of the check represented the $49,728.00 accelerated balance due on the Acker/Baldwin contract; $2,378.44 in interest calculated at 9% from July 25, 1996 to February 4, 1997; $1946.67 in unpaid

taxes with interest and penalties calculated to February 4, 1997; and $200.00 in attorney fees.  The only questions at issue then are whether the Quigleys' default was due to a grossly negligent, willful, or fraudulent breach of duty, and whether the facts and circumstances of this case warrant equitable relief from forfeiture.

¶35  The Ackers contend that the Quigleys' default was due to a grossly negligent, willful, or fraudulent breach of duty, and that the facts and circumstances of this case do not warrant relief from forfeiture.  The Ackers cite Kovacich v. Metals Bank & Trust Co. (1961), 139 Mont. 449, 451-52, 365 P.2d 639, 640, for the rule that a mere inability to pay is not sufficient to appeal to the conscience of a court of equity and relieve a party from forfeiture.  In Kovacich, we held that buyers of a mobile home who had defaulted on the sales contract, and who were unable to make further payments due to an employment strike, were not entitled to relief from forfeiture.  Kovacich, 139 Mont. at 451-52, 365 P.2d at 640-41.  The Ackers argue that Kovacich directly applies to the instant case, and that the Quigleys' inability to make the August 1996 payment on time is insufficient to invoke equitable relief from forfeiture.

¶36  We reject the Ackers' argument because Kovacich is distinguishable from the instant case.  The instant case is not a case of "mere" inability to pay.  The Quigleys took affirmative steps to cure their default and eventually tendered full compensation for their obligation.  The Quigleys  tried to collect accounts receivable from their California construction business, they applied for loans, and they attempted to sell Section 19 to Sherry Nicholas.  Within six months, the Quigleys tendered full compensation to the Ackers.  In contrast, the Kovaciches took no affirmative steps to cure their default and failed to tender full compensation to the sellers.

¶37  This Court considers several factors in determining whether a party's default was the result of a grossly negligent, willful, or fraudulent breach of duty.  These factors include: (1) whether the party experienced financial setbacks beyond his control; (2) whether the party made good faith efforts to raise money to pay the accelerated balance; and (3) whether the party tendered full compensation of the accelerated balance within a reasonable time.  Parrott, 171 Mont. at 215, 557 P.2d at 820-21.  See also Yellowstone Co., 115 Mont. at 416-17, 145 P.2d at 517-18; Sharp v. Holthusen (1980), 189 Mont. 469, 473-75, 616 P.2d 374, 377-78.  In Parrott, we granted equitable relief from forfeiture to buyers in default on a real estate contract based on the following considerations: (1) the buyers suffered a financial set back due to crop failure and an inability to collect from their debtors; (2) the buyers attempted to secure a loan but were unsuccessful due to a judgment lien that had been filed against their property; (3) the buyers secured employment outside of their farming operation to help make the accelerated payment; and (4) the buyers made the accelerated payment within nine months of their default.  Parrott, 171 Mont. at 215, 557 P.2d at 820-21.

¶38  Another important factor in our determination is whether the party made significant improvements and paid a significant amount of the principal before default such that a forfeiture would result in the seller's unjust

enrichment. Roberts v. Morin (1982), 198 Mont. 233, 241, 645 P.2d 423, 428. In Roberts, we noted that if forfeiture were imposed, the seller would receive the property, not at its 1974 value of $9,500, but at its greatly increased 1982 value of $23,000. The seller would also receive the benefit of improvements valued at $4981. This factor, coupled with other factors mitigating against forfeiture, led us to conclude that the buyer was entitled to relief from forfeiture. Roberts, 198 Mont. at 241, 645 P.2d at 428. See also Sharp, 189 Mont. at 473-75, 616 P.2d at 377-78; Blakely v. Kelstrup (1994), 267 Mont. 274, 278, 883 P.2d 814, 817.

¶39 In the instant case, it is evident from the District Court's Findings of Fact and Conclusions of Law that the court considered these factors in granting relief from forfeiture to the Quigleys. The court found that the Quigleys suffered a financial setback due to circumstances beyond their control, that the Quigleys made good faith efforts to raise money to pay the accelerated balance, that the Quigleys tendered full compensation of the accelerated balance within a reasonable time, and that a forfeiture would result in unjust enrichment, or a "windfall," to the Ackers. The Ackers have not submitted, nor have we found, any facts in the record at variance with the court's findings. The Ackers only dispute the court's discretionary finding that forfeiture of the Acker/Baldwin contract would be inequitable because it allows the Ackers a windfall. The Ackers counter that it is just as inequitable to grant the Quigleys relief from forfeiture because it allows them a windfall. However, the Ackers have provided no facts, analysis, or case law in support of their position. The record clearly shows that upon forfeiture, the Ackers would keep more than $300,000 in principal payments plus interest, would have the Quigleys' $20,000 in improvements, and would retain Section 19 valued at nearly double the amount of the Ackers original sale price. We determine that sufficient evidence exists in the record to support the District Court's finding that a forfeiture of the Acker/Baldwin contract would result in unjust enrichment to the Ackers.

¶40 The facts of this case warrant application of § 28-1-104, MCA. Therefore, we hold that the District Court did not err in granting the Quigleys relief from forfeiture.

Issue 3

¶41 Did the District Court err in ordering the parties to pay their own attorney fees and costs?

¶42 In their cross-appeal, the Quigleys claim the District Court erred in not awarding them attorney fees and costs. Section 25-10-301, MCA, provides:
    Determining compensation of attorneys. The measure and
    mode of compensation of attorneys and counselors at law is left
    to agreement, express or implied, of the parties . . . . But parties
    to actions or proceedings are entitled to costs and disbursements
    as provided by law.

    With respect to attorney fees, the Quigleys and Ackers expressly agreed in paragraph XVII of the Acker/Baldwin contract that "[i]f litigation occurs concerning the rights of any party in this agreement, the successful party shall

recover reasonable attorney fees . . . ." Section 28-3-401, MCA, provides that if the language of a written agreement is clear and does not involve an absurdity, the language governs the interpretation of the agreement. Also, we have held that where the language of a contract is clear and unambiguous, it is the trial court's duty to enforce the contract as written. Wortman v. Griff (1982), 200 Mont. 528, 536, 651 P.2d 998, 1002. The language of paragraph XVII of the Acker/Baldwin contract is clear and unambiguous, and does not involve an absurdity. Therefore, it was error for the District Court not to have enforced the provision as written and awarded attorney fees to the Quigleys.

¶43 With respect to court costs, Section 25-10-101(5), MCA, provides that costs are allowed as a matter of course to a successful plaintiff in an action involving "the title or possession or right of possession of real estate . . . ." The Quigleys have met the requirements of this statute. This case clearly involves title or possession of real estate, and the Quigleys received judgment in their favor. Upon these facts, the District Court erred in not awarding the Quigleys their costs of suit.

¶44 We therefore reverse and remand for determination of attorney fees and costs incurred, and for further proceedings consistent with this opinion.

Issue 4

¶45 Are the Quigleys entitled to attorney fees and costs on appeal?

¶46 The Quigleys request that they be awarded attorney fees and costs on appeal. Costs on appeal in civil actions are automatically awarded to the prevailing party under Rule 33, M.R.App.P. Additionally, we previously have held that where an award of attorney fees is based on a contract, the prevailing party is also entitled to an award of reasonable attorney fees incurred on appeal. Smith v. Johnson (1990), 245 Mont. 137, 145, 798 P.2d 106, 111 (citing Lauderdale v. Grauman (1986), 223 Mont. 357, 359, 725 P.2d 1199, 1200). Because the Quigleys are the prevailing party on appeal, we hold that they are entitled to reasonable attorney fees and costs incurred in this appeal.

¶47 We affirm in part, reverse in part, and remand to the District Court for determination and award of the Quigleys' attorney fees and costs, both below and on appeal.

/S/ WILLIAM E. HUNT, SR.

We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JIM REGNIER
/S/ TERRY N. TRIEWEILER