No. 99-419

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 151N

JUANITA McCORD, f/k/a

JUANITA ASHCRAFT,

Plaintiff/Respondent/Cross-Appellant,

v.

FIRST EQUITY RANCHES, a Colorado Limited

Partnership; NORMAN GRANVILLE ASHCRAFT,

JR.; DALE A. REID; CLEDA A. REID; and RUBY

VALLEY NATIONAL BANK,

Defendants/Appellants/Cross-Respondents.

APPEAL FROM: District Court of the Fifth Judicial District,

In and for the County of Madison,

The Honorable Frank M. Davis, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Nicholas P. Anderson, Anderson & Anderson, Missoula, Montana

For Respondent:

Mark P. Yeshe, Helena, Montana; Loren Tucker, Virginia City, Montana; Robert McCarthy, Butte, Montana

Submitted on Briefs: December 16, 1999

Decided: June 8, 2000

Filed:

_____

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent but shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.

¶2 Dale and Cleda Reid (the Reids) appeal and Juanita McCord, f/k/a Juanita Ashcraft (Juanita), cross-appeals from the Findings of Fact and Conclusions of Law of the Fifth Judicial District Court, Madison County, continuing to restrain default and forfeiture proceedings instituted against ranch property. We affirm.

¶3 The Reids raise the following three issues on appeal:

¶4 (1) Did the District Court err in denying the Reids a forfeiture upon default?

¶5 (2) Did the District Court err in granting Juanita an injunction to prevent a default?

¶6 (3) Did the District Court err in ordering Juanita to sell the eighty-acre parcel without exercising the option as required by the assignment?

¶7 Juanita's cross-appeal, which challenges the "practicalities" of the District Court's directive to sell the ranch property within sixty days or suffer foreclosure, will be addressed in the context of the third issue on appeal.

## Factual and Procedural History

¶8 On April 20, 1979, the Reids and Michael and Betty Boyd (the Boyds) entered into a contract for the sale and purchase of approximately 240 acres of ranch land in Madison County, Montana, with First Equity Ranches, a Colorado limited partnership. The purchase price was $200,000. Following an initial down payment of $55,000, annual payments of $14,169.40 were due, commencing in 1980, on April 20th of each year. However, the contract provided for a sixty-day grace period from the due date for the making of the annual payment. The parties agreed that if the annual payment remained in arrears for sixty days, this would constitute a default and First Equity Ranches could, at its option, retake possession and terminate the contract.

¶9 Sometime after execution of the 1979 contract, the Boyds assigned their interest in the contract to the Reids, leaving them as the sole buyers. The Reids satisfied their contractual obligations until they assigned their interest in the contract, on June 18, 1987, to C.D. Acres, a general partnership comprised of Norman Ashcraft, Jr. (Chip), and David Banks. Consideration for the assignment was the sum of $51,029.20, and payment was to be made in two parts. The Reids received a cash payment of $11,029.20 upon execution of the assignment. The parties then agreed in the assignment that the remainder due would be secured by an "option," under which eighty acres of the ranch property would be segregated from the total acreage and C.D. Acres would be given the option to purchase this eighty acres for $40,000 upon sixty days written notice to the Reids. To effect this agreement, the parties agreed to place two documents in escrow: one, a warranty deed to the eighty acres from C.D. Acres to the Reids in the event the assignees completed the underlying sales contract but did not exercise the option; and two, a quitclaim deed to the eighty acres from the Reids to C.D. Acres if the option was exercised. As the assignees, Chip and David Banks were required to make the annual payments to First Equity Ranches; if the assignees defaulted on the sales contract, then their interest in the ranch property would revert to the Reids. Subsequently, the C.D. Acres partnership was dissolved and, in 1988, David Banks assigned his interest in the contract to Chip.

¶10 Chip and Juanita were married on March 5, 1989, and lived together on the ranch property. The decree dissolving their marriage was filed on February 2, 1996. In the

dissolution decree, the District Court ordered that the ranch property be divided equally among Chip and Juanita; or, if the parties were unable to agree on a formula for dividing the property, that the property be placed on the market for sale and the net proceeds divided equally among Chip and Juanita. Chip and Juanita were unable to agree upon the division of the ranch property. Thus, on June 5, 1996, Juanita filed a motion to compel sale of the ranch, and the District Court directed that the property be listed for sale.

¶11 On March 3, 1997, Juanita moved to have Chip removed from the ranch property, where he was still residing. Juanita alleged that Chip was interfering with the sale of the property by threatening potential purchasers. Prior to a hearing on the motion, the parties reached an agreement which was subsequently filed with the court. In this agreement, the parties stipulated that Chip would remain on the ranch property and that Juanita would be entitled to show the land to prospective purchasers without interference by Chip. It was Juanita's understanding and belief that Chip would continue to make the annual contract payment to First Equity Ranches, since he was residing on the ranch property and receiving income from it.

¶12 Thereafter, Juanita kept herself informed as to whether Chip had made the annual payment by periodically calling the bank. Upon contacting the bank on June 16, 1997, Juanita learned that Chip had failed to make the annual payment for 1997. Thus, on June 17, 1997, Juanita filed a complaint for equitable and injunctive relief and an application for preliminary injunction and temporary restraining order. In her complaint, Juanita stated that although she was not a signatory to any of the contracts relating to the ranch property, she had an equitable interest in the land via the divorce decree. Juanita alleged in the complaint that Chip was either unwilling or unable to make the annual land payment, and that she was capable of making the payment but needed 120 days to obtain the funds. Noting that a total of $295,879.80 had been paid to First Equity Ranches under the contract for sale, the complaint claimed that it would be inequitable and constitute unjust enrichment for Juanita not to have the opportunity to cure Chip's default in payment to First Equity Ranches.

¶13 On June 17, 1997, the District Court issued a preliminary injunction and temporary restraining order, and scheduled a show cause hearing. Dale Reid contacted the bank on June 18, 1997, and was told that Chip had failed to make the annual payment. To avoid a default, the Reids tendered the annual payment on June 19, 1997, the last day for making the payment prior to expiration of the sixty-day grace period under the original sales contract. On June 24, 1997, Chip's attorney wrote to Juanita's attorney, stating that Chip

no longer owned the ranch property and did not have any control over it. Juanita moved to continue the preliminary injunction on June 27, 1997. The motion, although noting that the Reids had made the annual payment for 1997 and that the contract was not in default, stated that counsel for both parties agreed that the preliminary injunction should remain in effect until the parties could determine their positions in an orderly fashion. On July 1, 1997, the District Court continued the injunction, and provided that either party could bring the matter back before the court.

¶14 In June of 1998, the Reids again made the annual payment under the sales contract. The Reids then filed a motion, on September 16, 1998, to extinguish the injunction and divest Chip and Juanita of any interest in the ranch property. The Reids' motion to extinguish was heard on May 5, 1999. At that hearing, the Reids testified that they had tendered the 1998 annual payment because they believed that Chip and Juanita had defaulted in 1997. Both Mr. and Mrs. Reid testified at the hearing that they were not interested in being "made whole financially" through reimbursement from Juanita; they wanted the ranch property instead. Chip testified that he had no interest in the ranch property. Juanita testified that she had been able to raise funds for the 1997 payment by July 10, 1997, and that she had then authorized her attorney to make an offer of reimbursement to the Reids. Juanita further testified that she had called the Reids on April 15, 1998, and informed them that she would make the 1998 land payment by June 15, 1998. Juanita's phone records corroborate that this call lasted eleven minutes. Nonetheless, the Reids made the 1998 annual payment on June 8, 1998.

¶15 The District Court, in its order, granted Juanita sixty days in which to sell the ranch property or else the restraining order would be dissolved and default and forfeiture effected. The court also provided that if Juanita were successful in selling the property, the Reids were entitled to reimbursement from the sales proceeds of all sums due with legal interest, including reasonable attorney's fees. Other facts will be set forth as necessary.

Discussion

¶16 (1) Did the District Court err in denying the Reids a forfeiture upon default?

¶17 Since relief from forfeiture is equitable in nature, we apply the standard of review found in § 3-2-204(5), MCA. Under § 3-2-204(5), MCA, this Court is empowered to determine all of the issues of the case and to do "complete justice." Quigley v. Acker, 1998 MT 72, ¶ 19, 288 Mont. 190, ¶ 19, 955 P.2d 1377, ¶ 19 (citing Glacier Park Co. v.

Mountain, Inc. (1997), 285 Mont. 420, 427, 949 P.2d 229, 233).

¶18 This Court has long recognized the equitable maxim that "equity abhors forfeitures." *Quigley*, ¶ 31 (citing Yellowstone County v. Wight (1943), 115 Mont. 411, 418, 145 P.2d 516, 518). Montana's anti-forfeiture statute, § 28-1-104, MCA, embodies this equitable policy and permits a district court to relieve a defaulting party from forfeiture in any case where the party " 'sets forth facts which appeal to the conscience of a court of equity.' " *Quigley*, ¶ 31 (quoting Parrott v. Heller (1976), 171 Mont. 212, 214, 557 P.2d 819, 820).

¶19 Section 28-1-104, MCA, sets forth the standard under which a defaulting party may be relieved from forfeiture:

> **Relief from forfeiture.** Whenever by the terms of an obligation a party thereto incurs a forfeiture or a loss in the nature of a forfeiture by reason of [that party's] failure to comply with its provisions, he [or she] may be relieved therefrom upon making full compensation to the other party, except in case of a grossly negligent, willful, or fraudulent breach of duty.

Section 28-1-104, MCA.

¶20 In addition to asserting facts which appeal to the conscience of a court of equity, a party requesting relief from forfeiture under § 28-1-104, MCA, must, as the Reids point out, also meet the statutory requirements of tendering full compensation within a reasonable time and showing that the breach of duty was not due to any grossly negligent, willful, or fraudulent conduct. *Glacier Park*, 285 Mont. at 428, 949 P.2d at 234. The Reids contend that the District Court must be reversed because Juanita has failed to meet the statutory requirements for relief from forfeiture. Specifically, the Reids argue that Juanita not only failed to tender full compensation under the contract but also acted in a grossly negligent or willful manner in seeking equitable relief from the District Court in the "eleventh hour" to prevent her default.

¶21 Juanita counters by arguing that the District Court's equitable discretion to grant relief from forfeiture was not, under the facts of this case, limited to the anti-forfeiture provisions of § 28-1-104, MCA, since she was not a party to any of the contracts at issue here and held only an equitable interest in the ranch property by virtue of the divorce decree. Furthermore, Juanita asserts that she has put forth facts that appeal to the conscience of a court of equity, therefore making equitable relief from forfeiture

appropriate notwithstanding the statutory requirements of § 28-1-104, MCA. We agree.

¶22 In interpreting the anti-forfeiture statute, this Court has noted that it was "enacted for the benefit of obligors whose failure to punctually perform would result in loss to them in the matters in respect to which they have contracted." *Yellowstone County*, 115 Mont. at 417, 145 P.2d at 518. The statute presupposes that the party seeking relief from forfeiture is in default. Section 28-1-104, MCA, would be directly on point were it Chip, rather than Juanita, who was challenging the Reids' forfeiture action. Here, however, Juanita invoked equity to prevent Chip's default from divesting her of the one-half interest in the ranch property which she acquired under the District Court's marital property distribution.

¶23 In support of its order to continue restraining the forfeiture proceeding for sixty days, the District Court found as follows:

> 3. The dissolution proceeding ordered the property sold and the proceeds equitably distributed.

> 4. The property was not sold due principally to the failure of [Chip] to cooperate. The litany of that lack of cooperation is well documented in the dissolution record, and will not be repeated here.

> 5. In the meantime, payments were not made, and the Reids implemented notice of default and forfeiture proceedings. The record established that [Chip] has an individual interest in the property under the style "C.D. Acres." There is substantial evidence that he is aiding and abetting the forfeiture proceeding, which could only be for the purpose of frustrating Juanita's efforts to effect a sale. [Emphasis added.]

¶24 The Reids do not challenge the foregoing findings of the District Court. Under the circumstances highlighted, to allow the Reids to effect a forfeiture against Juanita because of Chip's collusive conduct would be abhorrent to equity in that it would be tantamount to endorsing fraud. Since it is universally accepted that "equity will not countenance fraud," the power of a court of equity to grant relief from fraudulent circumstances "upon a proper showing" is said to be "inherent" in the court's "general jurisdiction." *See* Bullard v. Zimmerman (1928), 82 Mont. 434, 452, 268 P. 512, 519-20 (citing several authorities); *see also* Mountain States Tel. & Tel. Co. v. Public Serv. Comm'n. (1959), 135 Mont. 170, 174-77, 338 P.2d 1044, 1047-48 (intimating that a district court's "general equity powers" may be invoked upon a "proper showing").

¶25 Thus, as a general rule,

> "it may be stated that in all cases, where by accident, or mistake, or fraud, or otherwise, a party has an unfair advantage in proceedings in a court of law, which must necessarily make that court an instrument of injustice, and it is therefore against conscience that [the party] should use that advantage, a court of equity will interfere and restrain [the party] from using the advantage . . . ."

*Bullard, 82 Mont. at 453, 268 P. at 520 (quoting Joseph Story, Equity Jurisprudence § 885).*

¶26 While we are not suggesting that the Reids have acted wrongly here in protecting their interest in the ranch property and seeking foreclosure, the mode or manner in which the fraud has been effected is of little consequence; a court of equity looks to the effect and asks if the result is a consequence of fraud. *Bullard*, 82 Mont. at 453, 268 P. at 520. To allow the Reids to take advantage of Chip's wrongful conduct in effecting foreclosure, thereby divesting Juanita of her equitable interest in the ranch property, would permit foreclosure to be the consequence of Chip's fraudulent conduct and the Reids' "unfair advantage" in the foreclosure proceeding because of that fraud.

¶27 An equity court whose jurisdiction has been invoked for an equitable purpose is empowered to "fashion an equitable result," Maddox v. Norman (1983), 206 Mont. 1, 14, 669 P.2d 230, 237, "and grant all relief necessary to the entire adjustment of the subject." Carpenters-Employers Retirement Trust Fund v. Galleria Partnership (1989), 239 Mont. 250, 265, 780 P.2d 608, 617. Not only is equity said to be more "flexible" and "liberal in its remedies" than law, but particularly in relieving from fraud, equity often affords a remedy that goes "not only beyond, but even contrary to the rules of law." *Bullard*, 82 Mont. at 453, 268 P. at 520; *see also* Hall v. Lommasson (1942), 113 Mont. 272, 281-82, 124 P.2d 694, 698 (noting that in administering complete equitable relief between the parties, a court sitting in equity may determine legal rights which would not otherwise be within its range of authority).

¶28 Although we are not unsympathetic to the Reids' reliance on the provisions of § 28-1-104, MCA, we conclude that under the facts of this case, the District Court was not confined to the anti-forfeiture statute in fashioning an equitable result and relieving Juanita from the unfair consequences of Chip's fraudulent conduct. In our view, there is little use in reiterating the maxim that "equity abhors forfeitures" unless the principle is enforced

when the facts warrant its application. There are several factors which make equitable relief from forfeiture appropriate here.

¶29 First of all, Juanita justifiably believed that Chip, as the obligor under the assignment contract and the party residing on and profiting from the ranch property, would continue making the annual payments on the sales contract until the property was sold. Second, the record is replete with evidence that Chip persistently interfered with Juanita's efforts at effecting a sale and sought to aid and abet the Reids' forfeiture action so as to deny Juanita her equitable interest in the ranch property as acquired under the dissolution decree. Third, and importantly, the Reids' notice of default was provided to Chip but not Juanita. In that regard, the Reids' suggestion that Juanita was well aware of the due date for the annual payment and simply failed to protect her interest in the ranch property is without force. Not only was it entirely reasonable for Juanita to believe that Chip would protect his interest in the ranch property by making the annual payment in a timely fashion, but this Court has held that a party cannot be expected to cure a default without reasonable notice that a default exists. *See* Roberts v. Morin (1982), 198 Mont. 233, 239, 645 P.2d 423, 427.

¶30 Juanita nevertheless protected her equitable interest in the ranch property by calling the bank prior to expiration of the sixty-day contractual grace period in 1997, by filing for equitable and injunctive relief to prevent Chip from forfeiting the ranch property, and by making an affirmative, good faith effort at raising the funds for the 1997 annual payment in less than one month's time. Upon acquiring the necessary funds, Juanita's attorney made an offer to the Reids' prior attorney to tender full reimbursement for the 1997 annual payment, which the Reids either rejected or never responded to.

¶31 Regarding the Reids' claim that Juanita slept on her rights in failing to raise the necessary funds for the 1997 annual payment prior to expiration of the sixty-day grace period, the record shows that in applying for injunctive relief in 1997, Juanita's attorney informed the Reids' prior attorney that a preliminary injunction would be sought to prevent Chip's default on the sales contract for the ranch property. Juanita applied for and received the preliminary injunction on June 17, 1997. The knowledge of that injunction must necessarily be imputed to the Reids. Notwithstanding their knowledge of the preliminary injunction, the Reids nevertheless tendered the 1997 annual payment to First Equity Ranches on June 19, 1997, two days after Juanita had already been granted injunctive relief to prevent Chip's default. And, although the Reids deny that Juanita ever offered to reimburse them for the 1997 annual payment, again the knowledge of that offer must be imputed to the Reids through their prior attorney.

¶32 When the 1998 annual payment became due, the preliminary injunction was still in effect by mutual agreement of Juanita and the Reids as recited in Juanita's June 27, 1997 motion for continuation of injunctive relief. Juanita's phone records show that on April 15, 1998, well before the due date for the 1998 annual payment, she made an eleven-minute phone call to the Reids. According to Juanita, she informed the Reids that she would be making the 1998 annual payment by June 15, 1998. While the Reids deny that Juanita ever stated that she would be making the 1998 annual payment, it is incredible to suggest that an eleven-minute phone call made just prior to the annual due date under the sales contract did not discuss the making of the 1998 annual payment. Juanita's bank records corroborate that she had the necessary funds for the 1998 annual payment available in her savings account from the beginning of May through the middle of June of 1998. Notwithstanding Juanita's phone call, the Reids tendered the 1998 annual payment on June 8, 1998, roughly one week prior to when Juanita had said she would be making the payment.

¶33 In light of the foregoing, the Reids' characterization of themselves as the "truly vigilant party" and Juanita as "grossly negligent" lacks credibility. The Reids knew or should have known that Juanita had attained injunctive relief in 1997 to prevent Chip's default, that Juanita had offered to fully reimburse them for the 1997 annual payment, and that Juanita had informed them prior to the 1998 due date that she would be making the 1998 annual payment to keep the sales contract current. Moreover, at the hearing, Juanita offered to fully reimburse the Reids from the sales proceeds for the ranch property.

¶34 Thus, notwithstanding the Reids' suggestion that Juanita comes to this Court with "unclean hands," we determine that Juanita acted prudently and in a manner which complies with the fundamental principle of equitable jurisprudence: that one who seeks equity must do equity. *Hall*, 113 Mont. at 281, 124 P.2d at 698. Under the facts of this case, we hold that the District Court did not err in restraining the Reids' forfeiture proceeding for sixty days to provide Juanita with an opportunity to attempt to effect a sale of the ranch property.

¶35 (2) Did the District Court err in granting Juanita an injunction to prevent a default?

¶36 The Reids claim that the District Court erred in granting Juanita an injunction to prevent the contract from going into default. In support of their position, the Reids cite § 27-19-103, MCA, which provides in part: "An injunction cannot be granted . . . to prevent the breach of a contract the performance of which would not be specifically

enforced . . . ." Section 27-19-103(5), MCA. As the Reids point out, in Westland Enterprises, Inc. v. Boyne USA, Inc. (1989), 237 Mont. 186, 772 P.2d 309, this Court observed the rarity with which injunctions are granted to prevent a breach of contract and relied on § 27-19-103(5), MCA, to reverse the trial court's grant of an injunction to prevent a possible breach of contract because the agreement at issue there was not specifically enforceable under § 27-1-412(5), MCA. *See Westland Enterprises*, 237 Mont. at 191-92, 772 P.2d at 312-13.

¶37 Juanita rightly indicates, however, that the list of non-specifically enforceable agreements set forth in § 27-1-412, MCA, does not encompass the installment land contract at issue here. Indeed, "[b]ecause the law considers each parcel of real property unique, the remedy of specific performance is available to either party upon a breach of an installment land contract." Robert Isham, *The Default Clause in the Installment Land Contract*, 42 Mont. L. Rev. 110, 127 (1981) (citing Spencer, *Remedies Available Under a Land Sale Contract*, 3 Willamette L.Rev. 164, 172 (1965); Lee, *Remedies for Breach of the Installment Land Contract*, 19 U. Miami L. Rev. 550, 555 (1965)). Thus, we agree with Juanita that § 27-19-103(5), MCA, has no bearing on the District Court's grant of an injunction. Since an installment land contract is specifically enforceable, we hold that the District Court did not err in granting Juanita an injunction to prevent default of the contract for the ranch property.

¶38 (3) Did the District Court err in ordering Juanita to sell the eighty-acre parcel without exercising the option as required by the assignment?

¶39 The Reids argue that the District Court erred in permitting Juanita to sell the ranch property without first requiring her to exercise the eighty-acre option and pay the Reids $40,000. According to the Reids, the language of the contract assignment is clear and unambiguous, providing that they are entitled to the warranty deed to the eighty acres held in escrow "when the full amount of the contract purchase price has been paid." Therefore, the Reids assert that the District Court erred in effectively rewriting the terms of the assignment contract to permit Juanita to sell the property without first exercising the option.

¶40 In truth, the District Court's order does not expressly address whether Juanita must exercise the option. We determine, nevertheless, that the District Court's resolution of this matter is consistent with the assignment contract. Under the terms of the assignment, the Reids agreed to grant an option to the assignees (now Juanita) to purchase the eighty-acre

parcel. That option was to "be exercised by a sixty (60) day written notice" to the Reids, with payment to be made "upon terms agreed to by the parties upon exercise of the option to purchase." Thus, while the assignment provides that title to the eighty acres will revert to the Reids automatically if the contract price is paid in full, this self-effectuating provision is qualified by the provision for exercise of the option by written notice to the Reids. Notably, the provision for exercise of the option does not state a particular time when the option must be exercised, so long as notice is provided to the Reids prior to completion of the underlying sales contract with First Equity Ranches. Under the terms of the assignment, Juanita is entitled to exercise the option by providing the Reids with notice at any time prior to tendering full payment to First Equity Ranches, with the terms for payment of the $40,000 to be agreed upon between Juanita and the Reids once such notice has been given.

¶41 That the Reids would rather have the ranch property than payment is clear. However, as Juanita suggests, the $40,000 option was intended to be consideration for the assignment which would compensate the Reids for their equity in the ranch property accumulated from several years of paying on the sales contract prior to its assignment. Although the Reids will not be entitled to the eighty acres if Juanita chooses to exercise the option, we fail to see how the District Court's grant to Juanita of sixty days in which to attempt to sell the ranch property denies the Reids the benefit of the option. If Juanita fails to exercise the option prior to final payment to First Equity Ranches, then the Reids will automatically succeed to legal title to the eighty acres. Then again, if Juanita fails to sell the property within the prescribed time period, the Reids will reassume the original sales contract and become entitled to legal title to the ranch property in its entirety upon complete payment to First Equity Ranches.

¶42 On the other hand, if within the sixty-day period Juanita successfully locates a buyer for the ranch property and provides written notice to the Reids prior to closing on that sale and acquiring legal title from First Equity Ranches, then, under the District Court's order, she must compensate the Reids the $40,000 plus legal interest accrued since the 1997 default. Under any of the above scenarios, the Reids will receive their equity in the ranch property. Should Juanita choose to exercise the option, the only possible loss the Reids would suffer by reason of the delay would be the "loss of the use" of the $40,000 since the time of default. *Yellowstone County*, 115 Mont. at 417, 145 P.2d at 517. However, the time value of that sum of money is fully compensated for by the District Court's order that Juanita pay legal interest on "all sums due" the Reids since they resumed payment on the sales contract in 1997. Put simply, there are no circumstances which make the District

Court's grant of relief to Juanita unjust or inequitable to the Reids.

¶43 We hold that the District Court did not err in balancing the equities between the parties and ordering the relief that it did. We reject Juanita's claim on cross-appeal that the District Court should have granted her more than sixty days in which to attempt to sell the ranch property. Nor do we concern ourselves with the "practicalities" of Juanita effecting a sale within the sixty-day period when, as the Reids point out, she does not hold legal title to the ranch property; that is a matter to be worked out, if at all, between Juanita, the Reids, and First Equity Ranches. Because we conclude that the sixty-day time period staying the forfeiture proceeding is entirely fair and reasonable for both parties involved, we decline to modify the District Court's grant of equitable relief to Juanita.

¶44 The District Court is affirmed in all respects.

/S/ WILLIAM E. HUNT, SR.

We Concur:

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON

/S/ JIM REGNIER

/S/ W. WILLIAM LEAPHART