Corrected Title Page

No. 91-432

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

---

WELDEN DAINES and GREAT FALLS LIMITED,

      Plaintiffs and Appellants,

  v.

KENNETH KNIGHT, GEORGE BUZZAS, and
NORTHWEST MOTOR INNS,

      Defendants and Respondents.

---

GRACIE OIL COMPANY, INC., a corporation,

      Plaintiff,

  v.

WELDEN DAINES and GREAT FALLS LIMITED,
a Utah limited partnership,

      Defendants.

---

APPEAL FROM:    District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable John M. McCarvel, Judge presiding.


COUNSEL OF RECORD:

      For Appellant:

            Ward E. Taleff and Kevin C. Meek, Alexander,
Baucus & Linnell, Great Falls, Montana

      For Respondent:

            Turner Graybill, Graybill, Ostrem,
Warner & Crotty, Great Falls, Montana

---

FILED

JAN 18 1995

Filed:

*Ed S.*
CLERK OF SUPREME...
STATE OF MONTANA

Submitted on Briefs: October 28, 1994

Decided: January 18, 1995

Clerk

Justice William E. Hunt, Sr., delivered the opinion of the Court.

Appellants Welden L. Daines and Great Falls Limited appeal from the findings of fact, conclusions of law, and final judgment of the Eighth Judicial District Court, Cascade County, denying the claims of appellants and granting judgment in favor of respondents Kenneth Knight, George Buzzas, and Northwest Motor Inns.

Affirmed.

Appellants raise the following issues on appeal:

1. Did the District Court err when it concluded that the September 16, 1981, option agreement between the parties was a sales contract rather an option contract?

2. Did the District Court err when it concluded that capital contributions were not required from respondents?

3. Did the District Court err when it concluded that respondents were entitled to recover damages under their counterclaim?

4. Did the District Court err when it awarded attorney fees and costs to respondents?

Northwest Motor Inns is a Montana limited partnership formed on June 3, 1976, for the purpose of acquiring, developing, and operating a Sheraton franchise in Great Falls. The original general partners were Welden Daines, George Buzzas, Kenneth Knight, and Harlan Nelson. Buzzas and Knight each held a one-third interest, while Nelson held a 16-2/3 interest, and Daines held a 15-2/3 interest.

Pursuant to the June 3, 1976, partnership agreement, Buzzas was the owner of the real property upon which the hotel was to be situated. Knight acted as the architect for the project. Daines performed the accounting services for the hotel, and Nelson managed the hotel jointly with Daines.

Following the May 4, 1981, death of Nelson, Knight and Buzzas terminated the partnership agreement against the wishes of Daines. The Eighth Judicial District Court held that Nelson's death was grounds for termination, but stayed execution of its order to allow Daines to appeal to this Court. Pending appeal, the parties resolved their differences on September 16, 1981, by executing the following five agreements:

1. Agreement Reconstituting Partnership: The parties agreed that Northwest Motor Inns would be reconstituted with Buzzas, Gracie Oil Company, and Welden L. Daines/Great Falls, Ltd. as general partners.

2. Agreement Reallocating Income and Losses: Gracie Oil Company and Buzzas agreed to transfer their shares of income to Daines, and Daines agreed to bear the losses attributable to Gracie Oil Company and Buzzas with the exception of any depreciation or investment credits. Northwest Motor Inns agreed to pay Gracie Oil Company and Buzzas $7875 per month as partners' salaries from September 1981, through January 1985. Default on any payment to either Gracie Oil Company or Buzzas was a default of the entire agreement. Any default unremedied for 30 days, after notice,

3

resulted in termination of the agreement, and each party would then return to its original partnership interest in income and losses.

3. _Option Agreement_: Buzzas and Gracie Oil Company granted Daines an option to purchase their two-thirds interest in the partnership in December 1985. Daines agreed to pay Buzzas and Gracie Oil Company $100,000 with the balance of $1,400,000 due in 1986 or to be financed as stipulated. Under the financing option, any uncured default would have resulted in the return of the two-thirds partnership interest to Gracie Oil Company and Buzzas.

4. _Letter Agreement Surrendering Management Control To Daines_: Gracie Oil Company and Buzzas agreed not to participate in or interfere with Daines' management of the hotel. Buzzas and Gracie Oil Company agreed to remove the names of Buzzas, Gracie Oil Company, and Knight from the signature cards of all hotel bank accounts.

5. _Indemnity Agreement_: Daines agreed to indemnify former partner Knight from liability or loss arising out of potential claims against Northwest Motor Inns.

In connection with the above agreements, the partnership interest of Knight in Northwest Motor Inns was transferred to Gracie Oil Company, Inc., and the partnership interest of Daines in Northwest Motor Inns was transferred to Great Falls Limited.

Beginning in the late fall of 1984, the $7875 payments to each respondent were not made as required under the terms of the agreement allocating income and losses. Respondents notified

4

appellants of the defaults on April 4, 1985, May 3, 1985, and May 16, 1985. In an effort to keep the partnership solvent, appellants requested additional capital contributions of $230,375 from respondents. Respondents did not comply with appellants' request. Daines contributed $150,000 to the partnership through personal loans to pay for operating expenses.

On August 2, 1985, as a result of the uncured defaults, respondents assumed control of the partnership and the day-to-day operations of the hotel. In December 1985, appellants attempted, unsuccessfully, to complete the purchase of respondents' two-thirds partnership interest in Northwest Motor Inns.

Appellants brought this action against Northwest Motor Inns, Gracie Oil Company, Inc., Buzzas, and Knight. Appellants sought a judicial determination that they had properly exercised their option to purchase the partnership interests of respondents in Northwest Motor Inns. In addition, appellants asked the court to determine the purchase price, and appellants sought to recover management and accounting fees. On motion of appellants, claims against Knight, and a claim to pierce the corporate veil of Gracie Oil, were withdrawn.

The court entered its final order and judgment ordering that all claims of appellants were dismissed with prejudice. In addition, the court entered judgment in favor of Buzzas in the amount of $203,477, and in favor of Gracie Oil in the amount of $203,477. The court awarded respondents $102,522.50 in attorney fees and $3686.90 in costs.

5

Appellants appeal from the court's findings of fact, conclusions of law, and final order and judgment.

## ISSUE 1

Did the District Court err when it concluded that the September 16, 1981, option agreement between the parties was a sales contract rather than an option contract?

The standard of review of a district court's findings of fact is whether the findings are clearly erroneous. Columbia Grain International v. Cereck (1993), 258 Mont. 414, 417, 852 P.2d 676, 678. In Interstate Production Credit Ass'n v. DeSaye (1991), 250 Mont. 320, 322, 820 P.2d 1285, 1287, we adopted a three-part test to determine whether a finding of fact is clearly erroneous. The test provides that:

1. We will determine if the findings are supported by substantial evidence;

2. If the findings are supported by substantial evidence, we will determine if the district court misapprehended the evidence; and

3. If the findings are supported by substantial evidence and that evidence has not been misapprehended, this Court may still determine whether that "'a finding is 'clearly erroneous' when . . . a review of the record leaves the court with the definite and firm conviction that a mistake has been committed.'" DeSaye, 820 P.2d 1287 (quoting United States v. U.S. Gypsum Co. (1948), 333 U.S. 364, 68 S. Ct. 525, 92 L. Ed. 746). We review conclusions of law to determine whether the district court's conclusions were

6

correct. In re Marriage of Barnard (1994), 264 Mont. 103, 106, 870 P.2d 91, 93 (citing In re Marriage of Burris (1993), 258 Mont. 265, 269, 852 P.2d 616, 619). We will apply the same standard of review to Issues 2 and 3.

The District Court found that Knight and Buzzas intended to sell their partnership interests to Daines following the death of Nelson. Buzzas and Knight determined that an immediate sale would deprive them of their share of depreciation of the partnership and would result in unfavorable tax consequences. On September 16, 1981, the parties executed five agreements, including an option agreement, which purported to grant appellants a purchase option which could only be exercised between December 1, 1985, and December 31, 1985. However, the District Court found that instead of executing an option contract, the parties executed a sales contract on September 16, 1981, subject to conditions precedent which were to be performed by December 31, 1985.

Under the option agreement, respondents each received $50,000 from Daines/Northwest Motor Inns upon execution. Under the terms of the agreement reallocating income and losses, Northwest Motor Inns agreed to pay respondents each a monthly salary of $7875 from September 1981 through December 31, 1985. The monthly salary was determined by calculating the monthly interest on the unpaid purchase price. We note the inconsistency between the agreement which allocated $7875 per month salary to each of the two parties, and the agreement surrendering management control to Daines under which the same two parties agreed not to participate in the

7

management of the hotel. As a result, there were no described services for which salary properly was due.

The District Court concluded that taken as a whole, the option agreement and the agreement reallocating income and losses constituted a conditional sale of respondents' interests in Northwest Motor Inns to appellants.

Appellants argue that the District Court erroneously concluded that the five documents executed on September 6, 1981, constituted an integrated agreement to sell respondents' partnership interests subject to conditions precedent.

The language of a contract governs its interpretation if the language is clear and explicit. Section 28-3-401, MCA. A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates. Section 28-3-402, MCA. A contract must be interpreted to give effect to the mutual intention of the parties as it existed at the time of contracting. Section 28-3-301, MCA. The name given to a contract, in this case "Option Agreement," is not conclusive as to its intent. It is the intention of the parties which is controlling, and that intention is to be determined by the applicable facts. Transcontinental Refrigeration Co. v. Figgins (1978), 179 Mont. 12, 18, 585 P.2d 1301, 1305.

Substantial testimony was offered at trial to support the District Court's conclusion that taken as a whole, the five agreements of September 16, 1981, reflect the parties' intention to execute a condition sale subject to conditions precedent.

8

Daines testified that the negotiations which resulted in the five agreements began with the premise that Daines would purchase the partnership interests of Buzzas and Knight in Northwest Motor Inns. Daines testified further that the original intent of the parties was that Daines would purchase the partnership interests of respondents through a long-term contract.

Knight, as a representative of Gracie Oil, and Buzzas testified that Daines offered to purchase their partnership interests for $700,000 each. Knight and Buzzas were advised that if they sold their interests to Daines in 1981, the depreciation recapture provisions of the Internal Revenue Code would reduce the $700,000 selling price to a $500,000 gain. To avoid this result, the parties negotiated a sale subject to conditions precedent to be performed by December 31, 1985. Knight testified that the option agreement and the agreement reallocating income and losses were negotiated together and operated in tandem to produce the desired result. The documents were drafted so that profits and losses belonged to Daines. In exchange, respondents would each receive $50,000 in September 1981; a monthly salary of $7875; and $700,000 in December 1985.

The parties agreed that respondents would not interfere on any level with Daines' management of the hotel. Also, the names of Buzzas and Knight were removed from the signature cards of all partnership bank accounts. From September 16, 1981, through August 1985, appellants had complete control over partnership funds and the operation of the hotel.

9

A sale is a contract by which one transfers to another an interest in property for a price. Section 30-11-101, MCA. By contrast, "an option contract confers a privilege and a right to elect to buy, but it does not impose any obligation to buy." Pollard v. City of Bozeman (1987), 228 Mont. 176, 180, 741 P.2d 776, 778. We are not persuaded by appellant's argument that the option agreement should be read in isolation and interpreted as an option conferring a privilege but imposing no obligation. A sales contract may be a single document or "[s]everal contracts relating to the same matters, between the same parties, and made as part of substantially one transaction . . . ." Section 28-3-203, MCA. The September 16, 1981, agreements were related to the same matters, were between the same parties, and were part of the same transaction. Reading the five agreements as an integrated document, it is clear that respondents transferred to appellants their interests in property for a price.

Performance of the transfer was subject to conditions precedent. "A condition precedent is one which is to be performed before some right dependent thereon accrues or some act dependent thereon is performed." Section 28-1-403, MCA. Before appellants' right to the partnership shares of respondents accrued, appellants were required to pay respondents $100,000 on September 16, 1981, and $1,400,000 by December 31, 1985. Northwest Motor Inns was required to pay respondents each $7875 per month until December 31, 1985.

10

The court's finding that the five September 16, 1981, agreements constituted an integrated sales agreement subject to conditions precedent is supported by substantial evidence.

We hold that the District Court did not err when it concluded that the September 16, 1981, option agreement between the parties was a sales contract rather than an option contract.

## ISSUE 2

Did the District Court err when it concluded that capital contributions were not required from respondents?

On June 10, 1985, appellants requested additional capital contributions of $230,375 from respondents. The District Court concluded that in view of its finding that a sale took place in September 1981, appellants were not entitled to require capital contributions from respondents.

Appellants argue that the District Court's finding that a sale, rather an option agreement, was executed on September 16, 1981, lead to the illogical conclusion that respondents were not required to make capital contributions. Appellants argue further that because the September 16, 1981, agreements do not constitute a sale, the 1976 management and partnership agreements of Northwest Motor Inns requiring general partners to provide capital contributions to prevent insolvency were still in effect.

We disagree. In our discussion of Issue 1, we pointed out that the five September 16, 1981, agreements constituted an integrated sales agreement rather than an option to purchase. Consequently, the 1976 management and partnership agreements no

11

longer applied to the reconstituted partnership. In addition, the reallocation agreement provided that appellants would bear the losses and receive the income previously attributable to respondents with the exception of any depreciation or interest credits. As a result, the losses that threatened the solvency of the Northwest Motors Inns were the responsibility of appellants, as were any capital contributions needed to prevent insolvency.

We hold that the District Court did not err when it concluded that capital contributions were not required from respondents.

ISSUE 3

Did the District Court err when it concluded that respondents were entitled to recover damages under their counterclaim?

Pursuant to the reallocation agreement, respondents agreed to transfer their shares of income from the partnership to appellants. Appellants agreed to bear any losses attributable to respondents. In consideration, appellants agreed to pay through Northwest Motor Inns, $7875 per month to each respondent until December 31, 1985. Appellants began to default on their payments to respondents in the late fall of 1984. The reallocation agreement provided that in the case of an uncured default, it would be automatically terminated and the parties would return to their original partnership positions.

On August 2, 1985, respondents resumed control of the partnership and the day-to-day operations of the hotel. As of that date, the District Court found that the partnership showed losses totalling $666,678, minus credits due appellants in the amount of

12

$56,245, for a net loss to the partnership of $610,432. Upon resuming control of the partnership and the day-to-day operations of the hotel, respondents guaranteed a $500,000 line of credit, of which the partnership borrowed approximately $250,000. The District Court found that respondents paid all past due accounts totalling $628,547. The District Court held that appellants were responsible to pay each respondent $203,477, one-third of the net losses suffered by the partnership between September 16, 1981, and August 2, 1985.

The court's findings are supported by substantial evidence provided by certified public accountant, Jack Stevens, who determined the partnership's losses by listing invoices unpaid by appellants between September 16, 1981, and August 2, 1985, and the subsequent payment of those invoices by respondents, less credits due appellants.

The measure of damages for a breach of contract is the amount which will compensate the aggrieved party for all detriment proximately caused by the breach. Section 27-1-311, MCA. In all cases, damages must be reasonable. Section, 27-1-302, MCA. The record shows that the District Court's award of damages was reasonable and compensated respondents for damages caused by appellants' breach of the agreement reallocating income and losses.

We hold that the District Court did not err when it concluded that respondents were entitled to recover damages under their counterclaim.

13

Did the District Court err when it awarded attorney fees and costs to respondents?

Awarding attorney fees is largely within the discretion of the district court and will not be disturbed absent a clear abuse of discretion. In re Marriage of Wackler (1993), 258 Mont 12, 17, 850 P.2d 963, 967; Smith v. Johnson (1990), 245 Mont. 137, 145, 798 P.2d 106, 111; Talmage v. Gruss (1983), 202 Mont. 410, 413, 658 P.2d 419, 421.

The reallocation agreement contains a default provision which provides that any default under the reallocation agreement is a default of the option agreement. The option agreement provides that "[i]f either party shall breach this option agreement, the defaulting party shall pay a reasonable attorney's fee and costs to the prevailing party for the enforcement of this option agreement, whether or nor legal process is instituted."

As previously mentioned, the District Court found that the five agreements constituted an integrated sales agreement subject to conditions precedent. As a result, we conclude that it is appropriate to apply the attorney fee provision contained in the option agreement to the default under the integrated sales agreement. Notice was given to appellants under that default provision, and appellants failed to remedy the default. As a result, we affirm the District Court's conclusion that respondents were entitled to attorney fees. A review of the record shows that the District Court acted within its discretion in fixing

respondents' attorney fees at $102,522.50. The District Court carefully reviewed the billing records of respondents' attorneys, and concluded that $102,522.50 properly compensated respondents for the expense of litigating the claims brought by appellants.

The District Court awarded respondents $3686.90 in costs for depositions taken in connection with this action brought by appellants. As the prevailing party, respondents are entitled to recover the cost of depositions used at trial. Section 25-10-201, MCA; Cash v. Otis Elevator Co. (1984), 210 Mont. 319, 333, 684 P.2d 1041, 1048.

We hold that the District Court did not err when it awarded attorney fees and costs to respondents.

Affirmed.

_William E. Hunt_
Justice

We concur:

_J. A. Turnage_
Chief Justice

_Karla M. Gray_

_Justices_

15

January 18, 1995

## CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

Ward E. Taleff
ALEXANDER, BAUCUS & LINNELL, P.C.
P.O. Box 2629
Great Falls, MT 59403

Turner Graybill
GRAYBILL, OSTREM, WARNER & CROTTY
# 18 Sixth St. No., Suite 200
Great Falls, MT 59403

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
Deputy