No. 00-043

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 193

300 Mont. 441

4 P.3d 1212

HUGH ESPY,

Plaintiff and Respondent,

v.

JOE QUINLAN and JOAN QUINLAN,

Defendants and Appellant.

APPEAL FROM: District Court of the Sixteenth Judicial District,

In and for the County of Rosebud,

The Honorable Wm. Nels Swandal, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Allen Beck, Attorney at Law, Billings, Montana

For Respondent:

Alan C. Bryan, Crowley, Haughey, Hanson, Toole, & Dietrich, P.L.L.P.,

Billings, Montana

Submitted on Briefs: June 8, 2000

Decided: July 18, 2000

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

¶1 The Plaintiff, Hugh Espy, commenced this action in the District Court for the Sixteenth Judicial District in Rosebud County and alleged that the Defendants, Joe and Joan Quinlan, interfered with his ditch easement. The Defendants filed a counterclaim in which they alleged interference with their road easement. Joe Quinlan was subsequently dismissed from the action. The District Court entered judgment for Espy on his claim and for Joan Quinlan on her counterclaim. The District Court ordered Quinlan to pay Espy's attorney's fees and costs pursuant to § 70-17-112(5), MCA. Quinlan appeals the District Court's judgment and order. We affirm the judgment and order of the District Court.

¶2 The following issues are presented on appeal:

¶3 1. Did the District Court err when it found a written agreement which granted Espy an easement over Quinlan's property?

¶4 2. Did the District Court err when it ordered Quinlan to pay Espy's attorney's fees and costs pursuant to § 70-17-112(5), MCA?

## FACTUAL BACKGROUND

¶5 The Plaintiff, Hugh Espy, owns real property which is contiguous with and adjacent to real property owned by the Defendant, Joan Quinlan. Both parcels of property are located within Rosebud County, Montana. Espy purchased his real property in February 1993 from the Farmers Home Administration (FmHA) following the FmHA's foreclosure on the property while owned by Timothy Cox.

¶6 Prior to 1985, Espy's predecessor in interest, Cox, irrigated the property using ditch

irrigation. This method required pushing the water uphill at two different points by using pumps. In his deposition, Cox testified that this method was inefficient due to the electricity costs and the amount of water loss. Cox's neighbor, Quinlan was also using a method of ditch irrigation which resulted in an unsatisfactory amount of water seepage.

¶7 On December 17, 1980, Cox and Quinlan executed a written Pooling Agreement with the United States Department of Agriculture (USDA) for the construction of an underground pipe irrigation system. The new irrigation system consisted of an underground pipeline originating on Quinlan's property and extending approximately 600 feet to Espy's property where it extended approximately 1200 feet. According to the Pooling Agreement, the purpose of the project was to "provide a water delivery system that will prevent seepage of water and an efficient irrigation delivery system." The Pooling Agreement was approved by the Agricultural Stabilization and Conservation Service (ASCS) of the USDA on March 3, 1981.

¶8 The Pooling Agreement, signed by both Cox and Quinlan, includes the following conditions:

> Each person signing . . . this agreement:
>
> . . . .
>
> 2. Agrees to perform the practice(s), in a professional manner within the specified general location, to repair, maintain, and use for the purpose authorized, the practice (s) covered by this agreement for which cost-sharing is given, and to obtain the authorities, rights, easements or other approvals necessary to perform, maintain, and repair such practices.
>
> 3. Grants such authorities, rights, easements, or other approvals to the other participants in this agreement to enter upon his land as may be necessary to install, maintain, and repair the practices.
>
> . . . .

¶9 Additionally, Cox and Quinlan entered into a cost-sharing agreement with the United States Government, pursuant to which the government paid $9433 of the total $11,122 cost and Cox and Quinlan agreed to contribute 69 percent and 31 percent, respectively, of

the remaining costs. It is the policy of the United States Government that cost-sharing is authorized only under certain circumstances, which includes permanently installed irrigation systems. The cost-sharing agreement defined the "life-span" of the irrigation system as 10 years.

¶10 The irrigation system was permanently installed in 1985. Espy became the owner of Cox's real property in 1993. In June of 1996, Quinlan had a portion of the pipeline dug up, and threatened to cap the line at its approach to Espy's property if Espy continued to use the irrigation system. Shortly thereafter, Espy and Quinlan met to discuss the irrigation system. Quinlan told Espy that she would cut the pipeline if Espy did not agree in writing to certain conditions, including relinquishing all rights Espy had in the easement. Following consultation with his attorney, Espy declined to agree to Quinlan's conditions.

¶11 In July 1997, in an attempt to prevent Espy from using the irrigation system, Quinlan removed the start button for the irrigation pump and shut off the electricity for the irrigation system. In May 1998, Quinlan placed a padlock on the electrical box which provides electricity to the irrigation system. In response, Espy filed this action against both Joan and Joe Quinlan on June 1, 1998, alleging interference with his easement. However, by stipulation of the parties, defendant Joe Quinlan was dismissed from the action. Espy additionally requested that the District Court issue a temporary restraining order to keep Quinlan from interfering any further with his use of the irrigation system. The District Court granted the temporary restraining order and on June 25, 1998 granted a preliminary injunction against Quinlan.

¶12 On November 13, 1998, the parties stipulated to allow Quinlan to file a permissive counterclaim against Espy. The counterclaim was deemed filed on November 18, 1998, and alleged that Espy had interfered with Quinlan's road easement over Espy's property. A bench trial was held on April 29, 1999 to consider Espy's claim and Quinlan's counterclaim. On June 4, 1999, the District Court entered its findings of fact, conclusions of law, and order, in which it concluded that Espy has a valid easement over Quinlan's property for the use and maintenance of the irrigation system and that Quinlan has a valid road easement over Espy's property. The District Court further concluded that both parties were entitled to a permanent order restraining the other party from interfering with their respective easement.

¶13 On July 26, 1999, the District Court held a hearing to consider the issue of awarding attorney's fees and costs. On September 3, 1999, the District Court entered its order which

required Quinlan to pay Espy's attorney's fees and costs pursuant to § 70-17-112(5), MCA. Following successful motions to amend the findings of fact and conclusions of law, and the judgment the District Court entered its amended judgment on November 26, 1999.

## STANDARD OF REVIEW

¶14 The standard of review of a district court's findings of fact is whether they are clearly erroneous. *See Daines v. Knight* (1995), 269 Mont. 320, 324, 888 P.2d 904, 906. A finding is clearly erroneous if it is not supported by substantial evidence, if the trial court misapprehended the effect of the evidence, or if this Court is left with a definite and firm conviction that the district court made a mistake. *See Daines v. Knight* (1995), 269 Mont. 320, 324, 888 P.2d 904, 906. The standard of review of a district court's conclusions of law is whether the court's interpretation of the law is correct. *See Carbon County v. Union Reserve Coal Co., Inc.* (1995), 271 Mont. 459, 469, 898 P.2d 680, 686. If a district court concludes that one party has prevailed and is entitled to attorney's fees, we review that conclusion to determine if it is correct. *Engel v. Gampp*, 2000 MT 17, ¶ 32, 57 St.Rep. 96, ¶ 32, 993 P.2d 701, ¶ 32.

## DISCUSSION

## ISSUE 1

¶15 Did the District Court err when it found a written agreement which granted Espy an easement over Quinlan's property?

¶16 Quinlan asserts that the District Court erred when it concluded that the Pooling Agreement created an easement for an indefinite duration. Quinlan contends that the Pooling Agreement created a contract for the period of ten years based on the language which describes the "life-span" of the project as "ten years following the year of installation." Espy asserts that the District Court correctly concluded that he has an easement for the use and maintenance of the irrigation system for an indefinite period of time.

¶17 The District Court made the following findings of fact:

7. That Quinlan did not seek legal advice before signing the Pooling Agreement, which clearly states that each participant in the agreement grants an easement or

right to the other participants to enter upon their land to install, maintain and repair the irrigation system. Paragraph 4 of the Pooling Agreement refers to securing easements and other documents from other people who are not participants to the agreement.

8. That while Quinlan testified that she never intended to give Cox an easement, that testimony is belied by the plain language of the Pooling Agreement and by Cox himself. The Court finds that Quinlan clearly gave Cox and Espy, Cox's predecessor in interest, an easement to repair and maintain the irrigation system.

. . . .

11. That the "life span" of the project is the minimum length of time the irrigation system must be used or a portion of the cost share refunded. It was not meant to limit the life expectancy of the easement, which is indefinite, as long as the irrigation system is properly used, maintained and repaired.

. . . .

16. That the plaintiff has an easement to use, maintain and repair the pipeline and the plaintiff's use of that easement should not be obstructed or impaired by the defendant.

¶18 Our review of the record reveals that the District Court's findings of fact are supported by substantial evidence and therefore are not clearly erroneous. The language of the Pooling Agreement is clear. The Agreement states that a condition of the Agreement is that each person signing the Agreement "[g]rants such authorities, rights, easements, or other approvals to the other participants in this agreement to enter upon his land as may be necessary to install, maintain, and repair the practices." Clearly, by signing the Pooling Agreement, both Cox and Quinlan granted each other such authorities, rights, easements, or other approvals to enter upon each other's land as may be necessary to install, maintain, and repair the irrigation system.

¶19 Quinlan further asserts that the language of a subsequent condition to the Pooling Agreement required that the parties designated agent, Cox, secure the easement on Quinlan's property. The condition relied on by Quinlan states that each person signing the Pooling Agreement:

4. Agrees that the person shown as such as designated agent and is authorized to act

for the parties of agreement in securing the necessary easements, rights-of-way, labor and equipment, construction details, compliance determinations, reports, and certifications, and contracts with the COC and designated technicians.

We agree with the District Court's finding that paragraph 4 of the Pooling Agreement refers to securing easements and other documents from people who are not participants to the agreement, and therefore does not affect an easement granted by participants to the agreement.

¶20 Moreover, the District Court's finding that the ten-year "life-span" of the irrigation system was related to the government's cost-sharing involvement, and not a limitation on the duration of the easement, is supported by substantial evidence. The document which defines the "life-span" of the irrigation project as "10 years following the year of installation" is a document which sets forth the conditions for government cost-sharing. As explained by Rosebud County Farm Service Agency Program Assistant, Diane Wyrick, "[e]ach conservation practice has a 'life-span' that requires the practice to be maintained for a minimum length of time or cost share must be refunded. The 'lifespan' is not the life expectancy of the practice." Accordingly, we conclude that the District Court's finding that the "life-span" of ten years was for cost-sharing purposes only and that the easement itself lasted for an indefinite period of time was not clearly erroneous.

¶21 Based on its findings of fact, the District Court made the following conclusions of law:

> 4. An easement may be created by grant, reservation, exception or covenant, by implication, or by prescription. *Kuhlman, v. Rivera,* 701 P.2d 982, 985 (Mont. 1985). To be a valid grant of an easement created by writing, it must satisfy the formal requirements of a grant. *Id.* The Pooling Agreement identified the participants, Joan Quinlan and Tim Cox, adequately described what was conveyed, had language of conveyance and was signed, thus satisfying the requirements of § 70-20-103, M.C.A., and granting a valid easement. *Id.* Specifically, the Pooling Agreement stated that each person signing the agreement granted to the other participants the right to enter onto their land as necessary to install, maintain and repair the irrigation system.

5. The duration of the easement is indefinite since, with proper maintenance and repair, the underground irrigation system could last for an indefinite period of time.

¶22 We conclude that the District Court's conclusions of law are correct. The Pooling Agreement satisfied the requirements of a grant and created a valid easement for Espy to enter onto Quinlan's property to install, maintain, and repair the irrigation system for as long as the system lasts. Therefore, we further conclude that the District Court did not err when it found that the Pooling Agreement created a valid easement on Quinlan's property.

## ISSUE 2

¶23 Did the District Court err when it ordered Quinlan to pay Espy's attorney's fees and costs pursuant to § 70-17-112(5), MCA?

¶24 Section 70-17-112, MCA, states as follows:

(1) A person with a canal or ditch easement has a secondary easement to enter, inspect, repair, and maintain a canal or ditch.

(2) No person may encroach upon or otherwise impair any easement for a canal or ditch used for irrigation or any other lawful domestic or commercial purpose, including carrying return water.

. . . .

(5) *If a legal action is brought to enforce the provisions of this section, the prevailing party is entitled to costs and reasonable attorney's fees.*

(Emphasis added).

¶25 Quinlan contends that the District Court erred when it concluded that Espy's interference with Quinlan's road easement was not related to Espy's suit against Quinlan for interference with his ditch easement pursuant to § 70-17-112, MCA. Quinlan asserts that because she prevailed on her counterclaim neither party can be considered a "prevailing party" within the contemplation of § 70-17-112(5), MCA. Quinlan contends that her counterclaim is related to the controversy over whether the Pooling Agreement created a ditch easement because had she not taken the position that Espy did not have a ditch easement, Espy would not have interfered with her road easement.

¶26 In support of her position, Quinlan relies on *Knudsen v. Taylor* (1984), 211 Mont. 459, 685 P.2d 354. In *Knudsen*, the parties brought a claim and a counterclaim involving

interference with a ditch. With respect to the issue of whether either party was entitled to attorney's fees and costs pursuant to § 70-17-112(5), MCA, we stated:

> The injunctive order issued by the District Court is a victory and a loss for both sides. Knudsen prevailed on his contention that the culvert must be of sufficient size to carry fully the water from the headgate passing through the Ester Ditch. Taylor prevailed in that his right to install such crossing culverts was recognized in this case. In such circumstances, we determine that the District Court was correct in finding in effect there was no prevailing party in the contemplation of section 70-17-112(5), MCA, and properly denied attorney fees.

*Knudsen*, 211 Mont. at 463-64, 685 P.2d at 357.

¶27 In this case the District Court concluded as follows:

Here, the counterclaim involved interference with a road easement. It had nothing to do with the ditch easement and was not brought to enforce the provisions of § 70-17-112. The plaintiff, therefore, prevailed on all claims brought pursuant to § 70-17-112 and is entitled to his reasonable attorney's fees and costs.

¶28 We agree with the District Court's conclusion. Quinlan's counterclaim was not raised pursuant to § 70-17-112, MCA. It was a permissive counterclaim dealing with a road easement. Consequently, our analysis in *Knudsen* does not apply to this case. Further, we have previously held that "in order to be deemed a 'prevailing party' for purposes of § 70-17-112(5), MCA . . . a party must successfully prevail on *all* claims raised pursuant to this statute." *Engel*, ¶ 40. Accordingly, because Espy successfully prevailed on all claims raised pursuant to § 70-17-112, MCA, he is entitled to his attorney's fees and costs pursuant to § 70-17-112(5), MCA, regardless of the fact that he was not the prevailing party on Quinlan's counterclaim. Therefore, we conclude that the District Court did not err when it determined that Espy was entitled to attorney's fees and costs pursuant to § 70-17-112(5), MCA. Additionally, Espy's costs and reasonable attorney's fees include those fees incurred in this appeal. *See Sharon v. Hayden* (1990), 246 Mont. 186, 190, 803 P.2d 1083, 1086.

¶29 The judgment of the District Court is affirmed and we remand for determination of Espy's attorney's fees and costs on appeal.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ WILLIAM E. HUNT, SR.

/S/ JIM REGNIER