No. 01-495

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 107

ROCKY WILLIAMS and JoELLEN WILLIAMS,

Plaintiffs/Respondents,

v.

SUSAN SCHWAGER and MARK SCHWAGER,

Defendants/Appellants.


APPEAL FROM: District Court of the Eleventh Judicial District,
In and for the County of Flathead,
The Honorable Ted O. Lympus, Judge presiding.


COUNSEL OF RECORD:

For Appellants:

Richard DeJana, Kalispell, Montana

For Respondents:

Kenneth O'Brien, Hash & O'Brien, Kalispell, Montana


Submitted on Briefs: November 29, 2001

Decided: May 23, 2002

Filed:


_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1      Rocky and JoEllen Williams (Williams) filed a complaint in the Eleventh Judicial District Court seeking injunctive relief precluding Mark and Susan Schwager (Schwagers) from interfering with a water well that the parties shared.  Schwagers filed a motion for summary judgment seeking a determination that Williams were not entitled to share the well. The District Court denied Schwagers' motion for summary judgment, concluding the shared water well agreement at issue was valid and enforceable against them.

¶2      Schwagers appealed the District Court's summary judgment ruling, claiming the court failed to consider Schwagers' counterclaims.  However, before this Court could consider the merits of the appeal, the parties entered into a stipulation requesting the case be remanded for further evidentiary hearings.

¶3      Upon remand, Schwagers filed a Request for Substitution, asking the District Court Judge to recuse himself.  The court denied the request and the case proceeded to a bench trial. On May 8, 2001, the District Court entered its Findings of Fact, Conclusions of Law and Judgment in favor of Williams.  Schwagers appeal the District Court's judgment and rationale and its denial of their request for substitution.  We affirm.

¶4      The dispositive issues on appeal are:

        1. Whether the District Court erred by enforcing the shared water well agreement; and

        2. Whether the District Court erred by denying a request for substitution of judge after the case was remanded back to the District Court.

**FACTUAL AND PROCEDURAL BACKGROUND**

2

¶5     This case involves certain real property in Flathead County, Montana, originally owned by R.L. and Mary Thompson (Thompsons). Thompsons subdivided the property into four tracts, two of which are at issue here. According to the Certificate of Subdivision Plat Approval (Subdivision Certificate), dated June 11, 1979, each of the four tracts would be used for one single family dwelling and "each individual water system [would] consist of a drilled well . . . ." The Subdivision Certificate provided that the Flathead County Health Department (FCHD) would review and approve proposed water and sewage systems for the individual properties. Both the County Sanitarian and the Subdivision Bureau of the State Environmental Sciences Division approved the Subdivision Certificate.[1] Eventually, Williams acquired Tract 3, which is adjacent to the tract purchased by Schwagers (Tract 4). The water well at issue in this matter rests on Tract 4. A brief review of these tracts' history is required as it pertains to the water well and its use by the previous and current owners.

¶6     In 1980, after the property was subdivided, Thompsons sold Tract 3 to Douglas Servo (Servo), who was Williams' predecessor in interest. When Thompsons showed Servo the property, they advised Servo that water for the tract would be provided from a well located on Tract 4, which was still owned by Thompsons at the time. Prior to purchasing the property in February of 1980, Servo went to the Office of the Flathead County Sanitarian (Sanitation Office) to verify that it was acceptable to have a shared well. At that time, and

_____

[1]State Environmental Sciences is now the Montana Department of Environmental Quality and for clarity, will be referred to as DEQ throughout the Opinion.

3

currently, the Sanitation Office was a division of the FCHD. Servo testified that the Sanitation Office informed him that shared wells were encouraged and that his septic permit application would be approved.

¶7 On February 21, 1980, in conjunction with the purchase of Tract 3, Thompsons and Servo entered into an agreement giving Servo the right to utilize the water well on Thompsons' tract by granting Servo an easement for the right to install, repair, replace, and maintain domestic water lines over Tract 4. This shared water well agreement (Agreement) provided for a $10 monthly water fee, payable to Thompsons, and also included a provision that the fee could be increased depending on changes in electricity costs associated with the well. The Agreement provided that it was binding on the parties, their heirs and assigns, and was later recorded in Flathead County, Montana.

¶8 Later in the Spring of 1980, Servo applied for a septic system permit with the FCHD, specifically submitting the application to the Sanitation Office. When he applied, Servo provided the relevant information to a clerk who filled out the application, including reference to the original 1979 Subdivision Certificate and information that the water source for Servo's property was a shared well on Thompsons' property. Before the application would be approved, Servo had to furnish the Sanitation Office with a copy of the well log, confirming a twenty-gallon per minute production. When Servo provided the information, he was advised that shared wells were encouraged. A registered county sanitarian approved Servo's permit application on April 30, 1980. The application was therefore approved

despite the fact that the 1979 Subdivision Certificate indicated that individual wells were required on each of the tracts.

¶9 Eventually, Williams acquired Tract 3 and moved onto the property in May, 1989. When they purchased the property, Williams were aware that their water source was a shared well on an adjacent tract. Williams received a copy of the Agreement, originally executed by Thompsons and Servo, and understood it to be binding on the owners of Tract 4 and themselves. Schwagers purchased Tract 4 in June, 1989. The warranty deed to them specifically provided that it was subject to the terms and conditions of the Agreement. Rocky Williams testified that shortly after Schwagers moved in, he and Mark Schwager discussed the Agreement and the form and timing of the water fee payments.

¶10 Mark Schwager described the water system, explaining that the well was approximately 100 feet from his house and contained a submersible pump, which was connected to a water line that runs to the pressure tank. At some point along this water line, another line runs to the house on Tract 3. The pressure tank itself is located inside the Schwagers' house, underneath the split-level entry stairway. When water was turned on in either house, the tank would turn on if the pressure was not enough to move the water through the lines. Once the pressure system activates, it may run continually, depending on the quantity of water being used and for how long it is used.

¶11 From 1989 to 1992, there were no disagreements between the parties concerning the well. In 1992, Schwagers requested an increase in the $10 water fee, as provided under the Agreement. While deciding what increase was warranted, the parties agreed to install an

5

electrical meter in the well house in an attempt to determine the exact amount of power being used. JoEllen Williams testified that over the summer months, Schwagers took readings from the meter to determine a modified water fee. At some point, however, Schwagers removed the meter without Williams' knowledge and the parties continued to disagree about how much the fee should be increased. Eventually the parties took the matter to Justice Court, and in 1993, that court set the new water fee at $13 per month.

¶12 In 1994, Schwagers began complaining to Williams that when the pressure tank activated late at night, noise from the tank disturbed their family. Susan Schwager, sent a letter to Williams in March of 1994, asking them not to activate the well pump late at night or all night long, since the noise from the pressure tank would wake the Schwager family, particularly the young children. Occasionally, the pressure tank was turned off, either from a power outage or when Schwagers manually shut off the electricity at the breaker panel in their house. When the pressure tank was turned off, well water could not be accessed by either house.

¶13 Relations between the parties deteriorated. Ultimately, Williams filed a complaint on October 5, 1995, seeking an order that enjoined Schwagers from interfering with the shared water well. The complaint also sought attorney's fees and punitive damages for willful, wanton and malicious actions by Schwagers. In their answer, Schwagers asserted that the water system was in violation of restrictions placed on the property under the Subdivision Certificate. Schwagers also counterclaimed, alleging that Williams were in arrears in the

water fee payments, had used the easement as a means of disturbing Schwagers, and had used the water supply for non-domestic purposes.

¶14 On June 4, 1996, Schwagers filed a motion for summary judgment, seeking a determination that Williams were not legally entitled to a shared well, and an order compelling them to comply with the Subdivision Certificate. The District Court held a hearing on the motion on September 24, 1996. After reviewing both oral and documentary evidence, the District Court entered its Findings of Fact, Conclusions of Law and Order on December 23, 1997. The court concluded that the water system constituted neither a private nor public nuisance and that the Agreement was valid and enforceable. The court denied Schwagers' motion for summary judgment and granted injunctive relief to Williams, enjoining Schwagers from further interfering with the water supply system.

¶15 On January 28, 1998, Schwagers appealed the District Court's ruling on summary judgment to this Court, claiming the District Court failed to consider their counterclaims. However, prior to a ruling on the appeal, the parties submitted a stipulation, asking this Court to remand the matter back to the District Court for a hearing on Schwagers' counterclaim issues and Williams' request for punitive damages. The parties also asked this Court to retain jurisdiction to determine if the District Court's conclusion concerning the legality of the Agreement was correct. In an Order dated July 29, 1998, we declined to consider the District Court's denial of summary judgment, noting that such a ruling was not appealable. Accordingly, Schwagers' appeal was dismissed without prejudice and the matter was remanded back to the District Court.

7

¶16    Schwagers then filed a request for rehearing or clarification of our July 29, 1998 Order.  Although the original Order appeared sufficiently clear, we granted the request for clarification, issuing a second Order dated August 18, 1998.  This Order explained that in light of the parties' stipulation, the only matter properly determined by the District Court's December 1997 Order was Schwagers' motion for summary judgment.  Thus, the only matter before us on appeal was the District Court's denial of summary judgment, which we determined was not appealable.  Accordingly, we dismissed the appeal without prejudice and ordered that, except as to the denial of Schwagers' motion for summary judgment, the District Court was directed to vacate it findings, conclusions and order dated December 23, 1997. Upon remand, Schwagers filed a request for substitution of judge.  The District Court denied the request and the matter proceeded to a bench trial on February 5, 2001.

¶17    During trial, the court heard testimony from Susan Schwager, JoEllen and Rocky Williams, Douglas Servo, two previous owners of the Schwager home, the current tenant in the Schwager home, and Glen Gray (Gray), the environmental health director with the FCHD.  Gray testified that the first portion of Servo's 1980 septic system application, including the information that the water supply for Servo's property was a shared well, was actually filled out by a clerk from the Sanitation Office.  Gray explained that at that time (1980), it was a custom for the office to allow a shared well if there was sufficient water available, and several permits like Servo's had been issued.  Gray testified that he was aware of more than twenty instances when the FCHD had permitted shared wells contrary to plat

8

approvals, and he added that at the time of the trial, there had been no enforcement action taken by the FCHD against either party utilizing the shared well.

¶18 Gray conceded that the FCHD was an agent of the State of Montana, in that it monitored the requirements contained in certificates of plat approval. Gray explained that one way his office could ensure compliance with subdivision certificates was through approval or disapproval of septic permits. Gray acknowledged that approval of Servo's septic permit was contrary to the Subdivision Certificate, and that although such approvals had been allowed on several occasions, there was no written policy endorsing such approval. Gray agreed that there was nothing in the records indicating Servo was advised that he did not have authorization to use the shared well. Moreover, Gray agreed that Servo's septic permit application made it known to the FCHD that the water system was a deviation from the Subdivision Certificate. Gray further agreed that while the Agreement to share the well was a deviation from the provisions in the Subdivision Certificate, a well shared by two parties is not necessarily illegal or unable to be approved. In fact, Gray also agreed that even today, the current owners could jointly apply for authorization to have a shared well.

¶19 Following trial and after reviewing deposition testimony of Mark Schwager and Christine Wilkonski, an employee of Water Well Services, who examined the parties' water system, the District Court entered its Findings of Fact, Conclusions of Law and Judgment. The court found that the Sanitation Office monitored compliance with certificates of subdivision plat approval and that it was customary for the Sanitation Office to approve a shared well if the water production was sufficient, even if the certificate of subdivision plat

9

approval may have called for individual wells. The court also found that the Agreement at issue had existed between the owners of Tracts 3 and 4 for approximately twenty years. Finally, the court found that Schwagers had demanded and accepted water fee payments from Williams as set forth in the Agreement, both prior to and following the Justice Court ruling in 1993.

¶20 The court concluded that the Agreement was not unlawful, invalid or unenforceable and was therefore binding on both the parties. The court further concluded that the doctrines of estoppel and waiver prevented Schwagers from claiming the Agreement was void and unenforceable, and that the Sanitation Office acted as an agent of the State of Montana in monitoring compliance with certificates of subdivision plat approval.

¶21 Judgment was entered for Williams. The court permanently enjoined Schwagers, their heirs, successors and assigns from interfering with Williams' water supply, and ordered Schwagers to participate in the filing of any joint application for the continued use of the shared well as might be required by any appropriate governmental agency. Schwagers appeal the District Court's order and rationale, and its denial of their request for substitution.

## STANDARD OF REVIEW

¶22 When we review a district court's findings of fact, the standard of review is whether those findings are clearly erroneous. *Pedersen v. Dawson County*, 2000 MT 339, ¶ 14, 303 Mont. 158, ¶ 14, 17 P.3d 393, ¶ 14 (citing *Daines v. Knight* (1995), 269 Mont. 320, 324, 888 P.2d 904, 906). When we review a district court's conclusions of law, our standard of review is plenary and we must determine whether the court's conclusions are correct as a matter of

10

law.  *Hampton v. Lewis and Clark County*, 2001 MT 81, ¶ 19, 305 Mont. 103, ¶ 19, 23 P.3d 908, ¶ 19 (citing *Lane v. Farmers Union Ins.*, 1999 MT 252, ¶ 15, 296 Mont. 267, ¶ 15, 989 P.2d 309, ¶ 15).

## DISCUSSION

### Issue 1

¶23    Did the District Court err by enforcing the shared water well agreement?

¶24    Schwagers maintain that at the time the Agreement was entered into, it violated the conditions of approval from the Subdivision Certificate, and accordingly, the District Court erred by enforcing an agreement that required performance of an unlawful act.  Schwagers argue that Williams have no right to use the shared well because the approval from the Subdivision Certificate allows only individual wells, and at no time have Williams, or their predecessors in interest, obtained approval from the State for the shared well.

¶25    Williams contend the Agreement was neither void nor unenforceable.  They note that Servo specifically followed the requirements of the Subdivision Certificate when he sought approval of the shared water well and his septic permit through the Sanitation Office.  In addition, Williams also point out that the County Sanitation Office was acting as an agent for the State by monitoring compliance with subdivision approval certificates, and argue that in its capacity as agent, the Sanitation Office approved Servo's septic permit which was based on a shared well, as was the custom at the time.

¶26    First, we conclude that the shared water well agreement is not illegal *per se*, as according to the FCHD, the parties may still obtain approval for the use of such a well even

11

where the Subdivision Certificate calls for individual wells. Although the Subdivision Certificate stated that "each individual water system will consist of a drilled well to a minimum depth of 25 feet," one may deviate from a certificate of plat approval by making an application.

¶27 We further conclude the Agreement is not unlawful or *void ab initio*. We note that the Subdivision Certificate was approved by both the State (DEQ) and County (County Sanitarian), and that the Subdivision Certificate included a provision that stated: "[P]lans for the proposed water and individual sewage systems will be reviewed and approved by the Flathead County Health Department before construction is started" (emphasis added). Servo followed this provision when he first went to the Sanitation Office seeking and obtaining approval (albeit oral) of the well prior to purchasing the tract and entering into the Agreement. Servo again followed this provision when he submitted the septic permit application to the same office. Servo's septic permit application referenced the Subdivision Certificate and again alerted the County to the shared well water system. Significantly, according to Gray, the Sanitation Office (i.e., FCHD) monitored compliance with certificates of subdivision plat approval by either approving or disapproving septic system applications. Here, the Sanitation Office approved Servo's application. Moreover, we note that the FCHD approval of shared wells was custom at the time. Therefore, we conclude the shared well at issue was not illegal or void.

¶28 Finally, we note that Schwagers accepted the benefits of the Agreement in the form of water fees from Williams, and also received an increase in the fee as a result of a Justice

12

Court determination in 1993. As we have held, a party may not rely on a contract and later attempt to benefit himself by repudiating it. *Glacier Campground v. Wild Rivers*, *Inc.* (1978), 182 Mont. 389, 400, 597 P.2d 689, 695 (citations omitted) (by instituting a proceeding, party elected to rely on the contract). Although Schwagers did not initiate the instant action, they did initiate a suit in Flathead County Justice Court to increase the water fee under the Agreement, and continued to benefit from the water fee arrangement set forth in the Agreement.

¶29     For the foregoing reasons, we conclude that the Agreement did not constitute an unlawful agreement requiring a determination that it is *void ab initio*. Accordingly, we conclude the District Court did not err in enforcing the Agreement.

## Issue 2

¶30     Did the District Court err by denying a request for substitution of judge after the case was remanded back to the District Court?

¶31     In its Order and Rationale denying the request for substitution, the District Court noted that in light of the parties' stipulation, the only District Court order from which Schwagers' first appeal came was the denial of summary judgment, which this Court concluded was not appealable and accordingly dismissed. Contrary to Schwagers' contention, the District Court concluded that our dismissal was not a reversal of the court's summary judgment ruling, and accordingly, Schwagers were not statutorily entitled to a substitution.

13

¶32 Schwagers argue that our remand of this case back to District Court effectively set aside the District Court's prior judgment, thus allowing Schwagers to seek a substitute judge under § 3-1-804(1)(g), MCA. For the proposition that the District Court's summary judgment was reversed and modified, Schwagers rely on the following language from our August 18, 1998 Order, which clarified our first Order from July 29, 1998:

> IT IS ORDERED that the defendants' motion for summary judgment was the only matter properly before the District Court and properly addressed by that court in its order dated December 23, 1997, and the District Court's denial of that motion is not appealable;

> IT IS FURTHER ORDERED that, except as to the denial of the defendants' motion for summary judgment, the District Court is directed to vacate its findings, conclusions and order dated December 23, 1997;

¶33 Williams contend that when this case was remanded back to the District Court, this Court did not rule on the merits of the case, since the remand was pursuant to stipulation of counsel. Williams argue that substitution of a judge pursuant to § 3-1-804(1)(g), MCA, requires a reversal of the trial court's rulings on the merits of this case, which, they argue, did not occur here.

¶34 Section 3-1-804(1)(g), MCA, provides in relevant part:

> When on appeal the judgment or order appealed from is reversed or modified and the cause is remanded to the district court for a new trial, *or when summary judgment* or judgment of dismissal *is reversed and the cause remanded*, each adverse party shall thereupon be entitled to one motion for substitution of judge in the manner provided herein. . . . No other right of further substitution shall arise in cases remanded by the supreme court. . . . [Emphasis added.]

14

¶35    Central to the remand in this matter was the parties' stipulation, in which they agreed that the District Court had erroneously and improvidently decided issues not before it, and requested that the matter be remanded for evidentiary hearings on issues not addressed by the court. Once this Court accepted the parties' stipulation and remanded the case for resolution on the merits, all issues on appeal to this Court were disposed of except the denial of summary judgment, which we declined to review because it was not final. Thus, nothing was decided on the merits of this case and it was remanded to the District Court.

¶36    We review a court's conclusions of law to determine whether the interpretation of the law is correct. *In re Marriage of Archibald*, 1999 MT 258, ¶ 4, 297 Mont. 20, ¶ 4, 993 P.2d 653, ¶ 4 (citation omitted). Moreover, when "interpreting legislative intent of statutory language, this Court first examines 'the plain meaning of the words used.' " *State v. Willson* (1991), 250 Mont. 241, 247, 818 P.2d 1199, 1203 (citation omitted) (plain language of § 3-1-804(1)(g), MCA, does not entitle defendant to substitution of sentencing judge when action remanded for resentencing).

¶37    The District Court's summary judgment, from which Schwagers first appealed, was not "reversed" by our Orders. Rather, we concluded that there was no appealable trial court ruling before us and accordingly dismissed the appeal without prejudice and remanded the matter back to the court for an evidentiary hearing pursuant to the parties' stipulation. Although in our August 18, 1998 Order, we directed the District Court to "vacate" its December 27, 1997 findings, conclusions and order, § 3-1-804(1)(g), MCA, clearly does not

15

contemplate allowing substitution of a judge when an order is vacated, and we will not infer such a meaning from the plain language of the statute.

¶38 Neither of our Orders involved any judgment on the merits, nor did they reverse the District Court's summary judgment ruling. Thus, there was no basis for Schwagers to seek substitution of the District Court Judge pursuant to § 3-1-804(1)(g), MCA, and we conclude the court did not err in denying Schwagers' request for substitution.

¶39 As a final matter, Schwagers have also appealed certain conclusions of law the District Court entered, alleging that one such conclusion estopped the FCHD and DEQ "from denying that the requirements of the subdivision plat had been lifted." Schwagers argue the District Court improperly entered judgment against those non-parties and asks this Court to set aside the court's conclusion.

¶40 We recognize that a non-party to an action cannot be a party to the judgment. *Pearson v. Virginia City Ranches Ass'n*, 2000 MT 12, ¶ 41, 298 Mont. 52, ¶ 41, 993 P.2d 688, ¶ 41 (plaintiffs not entitled to injunctive relief against parties not named as individual defendants); and *Kessinger v. Matulevich* (1996), 278 Mont. 450, 460, 925 P.2d 864, 870-71 (district court erred in declaring a private prescriptive easement was established by two non-parties to the action). Moreover, "it is a fundamental principle of our jurisprudence that it is only against a party to the action that a judgment can be taken and that the judgment is not binding against a stranger to the action." *Pearson*, ¶ 41 (citing *Kessinger*, 278 Mont. at 460, 925 P.2d at 870).

16

¶41 However, we need not resolve issues purporting to adjudicate rights or obligations of non-parties, because the issue before us here involves the validity of the Agreement as to the shared well, not enforcement of the provisions of the Subdivision Certificate, which implicates rights and obligations of the County and State. The question of the Subdivision Certificate's enforcement is neither relevant, nor material, to the issue before us. Moreover, while both the State and County have informed the parties they may be in violation of the Subdivision Certificate, neither agency has sought enforcement, and whether such enforcement will ever be initiated is speculation.

¶42 The propriety of the District Court's conclusion concerning non-parties does not affect the outcome here. Here, the question is whether the Agreement is valid and enforceable as between Williams and Schwagers. So, right or wrong, we will not disturb the District Court's conclusions concerning the non-party governmental agencies.

¶43 Accordingly, we affirm.

/S/ PATRICIA COTTER

We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JIM REGNIER

Justice W. William Leaphart did not participate in this Opinion.

17