No. 02-240

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 318

BIO-SEPTIC SYSTEMS, LLC.,

        Plaintiff and Respondent,

   and

TERRY J. CULLINAN,

        Plaintiff and Appellant,

   v.

MAX WEISS,

        Defendant and Respondent.

APPEAL FROM:    District Court of the Fourth Judicial District,
                In and For the County of Missoula,
                Honorable John W. Larson, Judge Presiding

COUNSEL OF RECORD:

        For Appellant:

        Timothy D. Geiszler, Geiszler & Newcomer, PLLP, Missoula, Montana

        For Respondents:

        James A. Manley, Manley Law Firm, Polson, Montana (Weiss)

        William T. Wagner, Garlington, Lohn & Robinson, Missoula, Montana
        (Bio-Septic)

Submitted on Briefs:  July 31, 2002

Decided:  December 19, 2002

Filed:

_____
                           Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1     Terry J. Cullinan appeals from the Findings of Fact, Conclusions of Law and Judgment of the Fourth Judicial District Court, Missoula County.  We affirm.

¶2     The following issues are raised on appeal:

¶3     (1) Whether the District Court erred in finding that Terry Cullinan acted vexatiously, arbitrarily, or not in good faith, or otherwise breached his fiduciary duties to Bio-Septic Systems, LLC;

¶4     (2) Whether the District Court erred in distributing the LLC's royalties to its former members;

¶5     (3) Whether the District Court erred in finding that Max Weiss did not breach his fiduciary duties to the LLC;

¶6     (4) Whether the District Court erred in finding that the deferred wage agreement, which served, in part, as the basis for Weiss's accounting of LLC debts, had been approved by the members of the LLC; and

¶7     (5) Whether the District Court erred in distributing an experimental Blackwater unit and $400 storage bill to Terry Cullinan.

PROCEDURAL BACKGROUND

¶8     In 1993, Max Weiss, the owner and operator of the Old Town Pub, in Missoula, Montana, began experimenting with, and eventually perfected, a sewage elimination device that he intended to market as an alternative waste disposal system for restaurants.  This device, which Weiss dubbed "The Remediator," utilized a bacteria that breaks down a

mixture of grease and wastewater commonly referred to as "Greywater." Terry Cullinan, a part-time carpenter and associate of Weiss, having won $240,000 in the lottery, offered to contribute funds to develop and patent The Remediator. On November 8, 1993, Cullinan gave Weiss $5,000 and the two agreed to market the device and share equally in future sales profits. They filed a patent application for The Remediator, listing themselves as co-inventors, and continued to work on a product design with the help of Phil Burgess and Glenn Hustetler. On January 23, 1994, Weiss, Cullinan, Burgess, and a newcomer, John Earll, formed Bio-Septic Systems, a limited liability company, to market The Remediator and distribute sales profits. Weiss and Cullinan each secured a 45 percent ownership in the LLC, and the remaining 10 percent was divided equally between Burgess and Earll. In time, the LLC gained additional investors, including Mr. Noble and the Butts.

¶9 As production of The Remediator continued, the LLC members instituted a compensation plan in which each member would be entitled to payment for two hours of work per day at $12.50 per hour. Members who worked more than two hours per day would be compensated accordingly. Having instituted this pay scale, the members agreed that Weiss would work full time while Cullinan and the others would put in whatever additional time the project demanded. Because income to the LLC was lacking, the members recorded their hours with the understanding that they would be paid at a later date. Weiss, on the other hand, was paid a monthly draw or partial payment against the hours that he worked.

¶10 In 1995, the LLC negotiated a marketing agreement with J. R. Smith Manufacturing Company of Alabama, and entered into a contract under which J. R. Smith began marketing

3

The Remediator world wide and contributed in excess of one million dollars to the project during the following years. In addition, J. R. Smith assumed development expenses and agreed to pay royalties to the LLC from sales of The Remediator.

¶11    In the fall of 1997, as Bio-Septic Systems was preparing to meet its first sale order, communication between Cullinan and the other members of the LLC broke down. Cullinan had surreptitiously assigned himself meaningless titles such as "Director of Overseas Development" and "Chief Disbursement Officer" and began fighting with the other LLC members about marketing, manufacturing, and financial problems. On December 17, 1996, Cullinan resigned as Chief Disbursement Officer and transferred to John Earll the responsibility of managing the LLC's finances. Earll immediately began settling up various LLC debts, which Cullinan had, until that time, refused to acknowledge. Eventually, Earll was forced to stop writing checks for the LLC when Cullinan accused him of fraud and threatened his family. Phil Burgess then continued where Earll left off until he too became the focus of Cullinan's acrimony.

¶12    By May 1997, it became apparent that Bio-Septic Systems was not receiving sufficient income to support itself and could not pay overhead or wages owed to the members. Earll, Burgess, and Weiss (who was no longer receiving a living wage for his work) proposed a strategy for modifying the LLC, whereby the members would no longer be employed by the company, and the office would close, eliminating some of the LLC's expenses. In essence, they felt that Bio-Septic Systems should serve merely as a tool for receiving and disbursing

4

sales income. Although Cullinan never clarified his understanding of the plan, the members passed a resolution effectuating the proposal.

¶13    Despite this last-ditch effort to hold Bio-Septic Systems together, the LLC eventually collapsed. Because of their deteriorating relationship with Cullinan, Earll and Burgess resigned, leaving Weiss to manage the LLC. Weiss concluded that the LLC was no longer a feasible endeavor and, on June 13, 1997, informed Cullinan and his attorney that he intended to dissolve the LLC and disburse the assets as provided by law. Weiss, Earll, and Burgess began the process of winding up Bio-Septic Systems. The LLC had exhausted its investment capital, and the only remaining sources of income were the monthly payments of $2,500 made by J. R. Smith for the LLC's consulting services. The members agreed that $1,700 of each payment would be disbursed as back pay to Weiss who, by that time, was accumulating unpaid earnings. The remaining $800 was used to pay overhead, debt, and compensation to Cullinan and Burgess. Before resigning, Burgess transferred the J. R. Smith payments to Weiss, who then paid himself, while earmarking the remaining funds for overhead and the debts of the LLC. This system continued despite accusations by Cullinan that Weiss was engaging in wrongdoing.

¶14    In July 1997, Weiss began working as an independent contractor for J. R. Smith. Weiss had notified Cullinan and the other members of the LLC that he intended to continue providing consulting services to J. R. Smith while doing business as Weiss Research. As consideration for these services, J. R. Smith then transferred to Weiss a purchase order,

5

which the marketer had originally issued to the LLC. Between 1997 and 2002, Weiss earned $2,500 per month, assisting J. R. Smith in marketing The Remediator.

¶15 At that time, Cullinan's relationship with J. R. Smith, like his relationship with the members of Bio-Septic Systems, began to falter. Cullinan notified J. R. Smith that it did not have exclusive worldwide distribution rights to The Remediator. In light of this declaration and Cullinan's subsequent attempt to renegotiate the marketing agreement, J. R. Smith and Glenn Hufstetler, who had become the sole manufacturer of The Remediator, were both reluctant to continue working with Cullinan or otherwise involve him in the production of the device. Despite objections from Cullinan, Hufstetler secured a loan from Glacier Bank to pay for the raw materials needed to continue manufacturing The Remediator. Prior to the break up of Bio-Septic Systems, Hufstetler had contracted with the LLC to provide manufacturing services. Under the loan agreement, J. R. Smith would pay the bank with sale proceeds, and the bank would repay its Hufstetler loan and, acting as an escrow agent, distribute any excess amounts to Bio-Septic Systems, including Weiss and Cullinan, as well as those who had invested in the LLC. This arrangement was intended to satisfy the manufacturing and marketing needs of J. R. Smith and Hufstetler, while covering the resulting debts owed to Glacier Bank and other creditors of the former LLC. Unhappy with the arrangement, Cullinan obtained a temporary restraining order against Weiss, preventing him from receiving payments from Glacier Bank. As a result, the bank refused to make further payments to both Cullinan and Weiss.

¶16    Cullinan initiated the present action on August 8, 1997. In his Complaint, he alleged that Bio-Septic Systems was in a state of disorder and was ready to be dissolved. Cullinan also alleged that Weiss had breached his fiduciary duties to the LLC. Weiss filed an Answer and Counterclaim, joining in Cullinan's request to dissolve the LLC. In response, Cullinan filed an Amended Complaint, alleging sole ownership of Bio-Septic Systems and waiving any further winding up. The Fourth Judicial District Court, Missoula County, granted partial summary judgment to Weiss on the Amended Complaint and, in November 2001, the case went to trial. On February 12, 2002, the District Court issued its findings of fact and conclusions of law, awarding judgment to Weiss. Cullinan then filed this appeal.

DISCUSSION

¶17    Cullinan's appeal focuses on eight findings and conclusions from the District Court's judgment. Cullinan first argues that the District Court erred in determining that he acted vexatiously, arbitrarily, or not in good faith, or that he otherwise breached his fiduciary duties to Bio-Septic Systems. He also asserts that the District Court erred in distributing the royalties of the LLC to its former members. In addition, Cullinan contends that the District Court erred in determining that Weiss did not breach his fiduciary duties to the LLC. He also maintains that the District Court erred in adopting the accounting of LLC debts offered by Weiss, and in determining that Weiss's deferred wage agreement had been approved by the members of the LLC. Finally, Cullinan argues that the District Court erred in determining that the experimental Blackwater unit, produced by Bio-Septic Systems as a prototype, belonged to him.

7

¶18     Our standard of review of a trial court's findings of fact is whether the findings are clearly erroneous. *Daines v. Knight* (1995), 269 Mont. 320, 324, 888 P.2d 904 (citing *Columbia Grain Int'l v. Cereck* (1993), 258 Mont. 414, 417, 852 P.2d 676, 678).  This analysis  involves the following three-part test:

> First, the Court will review the record to see if the findings are supported by substantial evidence.  Second, if the findings are supported by substantial evidence, [the Court] will determine if the trial court has misapprehended the effect of evidence. [Citations omitted.]  Third, if substantial evidence exists and the effect of the evidence has not been misapprehended, the Court may still find that "[A] finding is 'clearly erroneous' when, although there is evidence to support it, a review of the record leaves the [C]ourt with the definite and firm conviction that a mistake has been committed."

*Interstate Prod. Credit Ass'n v. DeSaye* (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287 (citing *United States v. United States Gypsum Co.* (1948), 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746).  Our standard of review of a trial court's conclusions of law is whether the court's interpretation of the law is correct. *Carbon County v. Union Reserve Coal Co.* (1995), 271 Mont. 459, 469, 898 P.2d 680, 686. *See also Kreger v. Francis* (1995), 271 Mont. 444, 447, 898 P.2d 672, 674; *Steer, Inc. v. Dep't of Revenue* (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603-04.

¶19    We first address Cullinan's argument that the District Court erred in determining that he acted vexatiously, arbitrarily, or not in good faith, or that he otherwise breached his fiduciary duties to Bio-Septic Systems.  Weiss alleged, in his Counterclaim, that Cullinan had breached his fiduciary duties to Bio-Septic Systems by wrongfully obstructing, delaying, and interfering with the dissolution and winding up of the LLC, and by attempting to sabotage the company's relationship with its marketer, manufacturer, and investors.  Weiss also sought damages for his legal costs resulting from Cullinan's conduct and the ensuing litigation.  On this basis, the District Court found that "Cullinan acted arbitrarily and thereby wrongfully obstructed, interfered with, and delayed the orderly winding up and dissolution of the LLC, pursuant to § 35-8-809(4), MCA."  The District Court also awarded Weiss his legal costs.

¶20    Section 35-8-809(4), MCA, provides that if, during a proceeding to dissolve an LLC, a trial court "finds that a party to the proceeding acted arbitrarily, vexatiously, or not in good faith, it may award one or more other parties reasonable expenses, including attorney's fees . . . ."  In support of its application of this provision, the District Court cited four examples of Cullinan's arbitrary and vexatious conduct, including (1) his denial of, and attempt to renegotiate, the exclusive marketing agreement with J. R. Smith; (2) his attempt to prevent payment of debts owed to Mr. Noble and the Butts; (3) his obstruction of Hufstetler's efforts to acquire financing from Glacier Bank; and (4) his attempt to terminate the arrangement between Hufstetler, J. R. Smith, and Glacier Bank, in which the bank acted as an escrow

agent, receiving sales proceeds from J. R. Smith, and then disbursing those proceeds to both Weiss and Cullinan.

¶21 With regard to Cullinan's renegotiation of the marketing agreement with J. R. Smith, the District Court noted that Cullinan had, in effect, refuted the exclusive worldwide distribution rights held by J. R. Smith, weakening the LLC's relationship with J. R. Smith, and causing the marketing agreement to become precariously uncertain. Cullinan argues that his challenge to J. R. Smith's claim to worldwide distribution rights was "reasonable and justified" because, at that time, no formal written marketing agreement had been created. However, as the District Court noted, the lack of a formal written marketing agreement, alone, did not warrant the four years of persistence and ferocity with which Cullinan pursued his challenge, and "effectively made it impossible to wind up and dissolve the LLC . . . ." That the marketing agreement remained intact in spite of this distraction does not, as Cullinan suggests, dispel the possibility that his conduct could have resulted in its failure. In other words, the disruptive nature of Cullinan's conduct was not negated by the survival of the agreement.

¶22 In addition, the District Court's findings addressed not only Cullinan's attempt to renegotiate the marketing agreement with J. R. Smith, but also his conduct with respect to the operation of the LLC. Evidence of Cullinan's attempt to prevent payments to Mr. Noble and the Butts is abundant. The District Court noted that Cullinan contested payments of LLC debts and, when Earll assumed the responsibility of paying creditors, Cullinan threatened him and his family. Likewise, the District Court cited numerous instances of Cullinan's efforts to

10

disrupt the arrangement between Hufstetler, J. R. Smith, and Glacier Bank. According to the District Court, "Cullinan made false, irresponsible representations about Weiss and Hufstetler to Hufstetler's lender [Glacier Bank] in an attempt to damage Hufstetler and Weiss." Cullinan also sought and obtained a restraining order preventing the bank from paying Weiss, thereby "shut[ting] down this process."

¶23 As these examples illustrate, the District Court's findings of fact are supported by substantial evidence. The record does not sustain Cullinan's contention that the District Court misinterpreted this evidence, or that the court's findings were clearly erroneous. The District Court did not err in determining that Cullinan acted vexatiously, arbitrarily, or not in good faith, or that he otherwise breached his fiduciary duties to Bio-Septic Systems. Nor did the District Court err in awarding legal costs to Weiss.

### Issue Two

¶24 We next consider Cullinan's argument that the District Court erred in distributing the royalties of Bio-Septic Systems to its former members. The District Court determined that "upon dissolution, the members own the rights to receive royalties from the invention for which the patent application was filed in this case, and which is generally known as 'The Remediator.'" According to Cullinan, the District Court contravened the well established federal rule that a licensee's interest in a patent is personal and not assignable unless expressly made so by a licensing agreement. He relies on *In re CFLC, Inc.* (9th Cir. 1996), 89 F.3d 673, 679, in which the Ninth Circuit Court of Appeals held that a non-exclusive licensee of a patent has a personal interest in the patent, which is not assignable absent the

11

licensee's authorization. Cullinan asserts that "because the license agreement from . . . Cullinan and Weiss does not expressly provide for assignment of the LLC's royalty interests to its members, that license for royalties is personal to the LLC and cannot be assigned to its members." On this basis, Cullinan contends that, upon the dissolution of Bio-Septic Systems, the royalty interests should revert back to the co-owners of the patent, Cullinan and Weiss.

¶25 Rather than address the legal question raised by Cullinan, Weiss notes that this issue was raised for the first time on appeal and is, therefore, procedurally barred. We have consistently held that unless fundamental rights are implicated, an issue not raised during trial court proceedings will not be addressed on appeal. *See State v. Whitehorn*, 2002 MT 54, ¶ 24, 309 Mont. 63, ¶ 24, 50 P.3d 121, ¶ 24. Finding nothing in the record to indicate that Cullinan presented this issue to the District Court, we decline to address this contention.

Issue Three

¶26 We next consider Cullinan's argument that the District Court erred in determining that Weiss did not breach his fiduciary duties to Bio-Septic Systems. Cullinan asserts that Weiss breached his fiduciary duties by appropriating funds of the LLC, and by creating a sole proprietorship and competing with the LLC, then terminating a payment plan between the LLC and J. R. Smith and transferring J. R. Smith's payments to himself. The District Court disagreed, concluding that "Cullinan failed to meet his burden of proving that Weiss breached any fiduciary obligations owed to the LLC or to Cullinan as a member of the LLC."

12

¶27 This conclusion is reasonable given that much of Cullinan's argument on appeal is composed of inferences which find little or no support in the record. It appears that Weiss's receipt of payments on behalf of Bio-Septic Systems was foremost an act of necessity. In December 1996, Cullinan abandoned his duties as the self-appointed disbursement officer, at which point Earll and Burgess began writing checks for the LLC. They also quit in response to Cullinan's continued complaints and threats. Weiss was the only remaining member who could pay off the overhead and debts of the LLC. As a result, the March and April 1997 payments made by J. R. Smith, in the amount of $2,510 were transferred to Weiss so that he could pay himself the salary to which he was entitled, as well as pay the expenses of Bio-Septic Systems. Weiss then prepared a resolution under which he would have the authority to receive the monthly payments made by J. R. Smith, and to disburse those payments to Bio-Septic Systems. Both Burgess and Earll signed the Resolution in May 1997. Although Cullinan contends that Weiss's assumption of control over the monthly income from J. R. Smith was improper, he offers no evidence that Weiss misappropriated those payments, or that the LLC suffered as a result of Weiss's handling of the funds. Instead, Cullinan suggests that Weiss's conduct "deprived the LLC and its members of managing the LLC assets and its business," a nonsensical statement in light of the fact that Cullinan, Earll, and Burgess each refused to be responsible for disbursing the monthly payments received by the LLC, leaving that responsibility to Weiss.

¶28 With regard to the validity of the May 1997 Resolution prepared by Weiss, Cullinan argues that because Burgess had signed it after withdrawing from the LLC, the Resolution

13

was ineffective. Regardless of whether Burgess, in fact, signed the Resolution after he withdrew from Bio-Septic Systems, such a mistake falls short of demonstrating that Weiss engaged in some sort of deception. It would reflect not on Weiss, but on the confusing circumstances under which the Resolution was created and executed. In other words, the record indicates that the Resolution, conferring to Weiss the authority to disburse the monthly income from J. R. Smith, was no less than a good faith attempt by Weiss, Earll, and Burgess to formalize that arrangement.

¶29    Equally unsupportable is Cullinan's argument that Weiss breached his fiduciary duties after 1997 by creating a sole proprietorship and competing with the LLC, then transferring J. R. Smith's payments to himself. Cullinan cites § 35-8-307(3)(l), MCA, which directs that "[u]nless the articles of organization or the operating agreement provide otherwise, the only matters of a member-managed or manager-managed company's business requiring the consent of all of the members [include] . . . the sale, lease, exchange, or other disposal of all, or substantially all, of the company's property with or without goodwill." Cullinan has mischaracterized the monthly payments received from J. R. Smith as property belonging to Bio-Septic Systems and, therefore, his reliance on the above statutes, in support of his contention that Weiss converted the property of the LLC, is unpersuasive. The LLC's monthly contract with J. R. Smith had expired by July 1997, after which J. R. Smith began paying Weiss for his continued services under a separate contract. At that time, Bio-Septic Systems was breaking up, and Weiss began working for J. R. Smith as an independent contractor after disclosing his intentions to Earll and Burgess. Under a revised purchase

14

order to Weiss, J. R. Smith began paying Weiss directly, and Weiss performed the same work that he had performed as a member of the LLC. These payments to Weiss were intended as compensation for his work as an independent contractor, and Cullinan has not established otherwise.

¶30 The District Court correctly determined that "Cullinan failed to meet his burden of proving that Weiss breached any fiduciary obligations owed to the LLC or to Cullinan as a member of the LLC."

Issue Four

¶31 We next consider Cullinan's argument that the District Court erred in adopting Weiss's accounting of the debts and obligations of Bio-Septic Systems, and in determining that Weiss's deferred wage agreement had been approved by the members of the LLC. According to Cullinan, the accounting that Weiss prepared was based on an invalid agreement with Earll and Burgess to defer the payment of wages to Weiss in violation of § 35-8-601, MCA, which provides, in part, that "each member shall share equally in any distribution" unless the members agree otherwise. Cullinan contends that no firm agreement was ever reached as to the method of calculating compensation to the LLC members, rendering the accounting prepared by Weiss unsupportable.

¶32 The District Court noted that each of the members of the LLC was entitled, by agreement, to compensation for two hours of work per day at $12.50 per hour. Under this agreement, Weiss, alone, was to receive compensation for eight hours of work per day at the same rate, most of which would be distributed on a deferred payment plan because the LLC

15

consistently suffered from insufficient income. In the simplest terms, Weiss received monthly payments which he deducted from the total amount owed to him by Bio-Septic Systems. In addition, when the other LLC members worked more than two hours per day, they were required to keep a record of this time in order to receive compensation. In part, based on this valuation method, the District Court concluded that Weiss was entitled to a net amount of $21,966.69, while Earll, Burgess, and Cullinan would receive $17,125, $11,096.28, and $15,995.67 respectively.

¶33 As the District Court noted, both Earll and Burgess confirmed that when forming Bio-Septic Systems, they had agreed to this system of compensation, as well as the deferred payment plan for Weiss. The District Court further observed that Cullinan's own documentation indicated that he had agreed to the plan. In a memorandum, dated December 1, 1996, Cullinan stated that he and Burgess would receive $500 per month for their services which, according to Weiss, was consistent with 40 hours of work per month at the agreed rate of $12.50 per hour. In addition, no where in his own accounting did Cullinan object to the distribution offered by Weiss. In light of this testimony and documentation, we conclude that there was substantial evidence to support the District Court's reliance on Weiss's valuation method.

## Issue Five

¶34 Finally, we consider Cullinan's argument that the District Court erred in determining that the experimental Blackwater unit, produced by Bio-Septic Systems as a prototype,

16

belonged to Cullinan. He asserts that there was no evidentiary support for this conclusion, and that the imposition of this responsibility is unfair.

¶35 The District Court found that Cullinan took possession of the prototype in 1997 and, accordingly, assumed ownership of the device. In support of this finding, the District Court noted that Cullinan requested the unit and paid for its storage. Weiss testified that Cullinan's storage costs amounted to $400, a bill which Cullinan paid because "he agreed to take custody of [the unit] years ago." Weiss further testified that he viewed this obligation as solely Cullinan's. Moreover, in his proposed findings of fact and conclusions of law, Cullinan requested ownership of the device, stating that he "is entitled to the Blackwater prototype, stored in Missoula." Weiss did not object to this request and maintained, instead, that "Cullinan should be entitled to all property interests in the Blackwater experimental device which has been in his possession since 1997, and which he has been storing." Absent an objection from Weiss, the District Court simply granted Cullinan's request. By arguing, on appeal, that he should not be burdened with the responsibility of maintaining the unit, Cullinan is advancing a blatant inconsistency.

¶36 Because Cullinan assumed ownership of the Blackwater unit and paid for its storage, and because he urged the District Court to find that he had a property interest in the unit, we conclude that the District Court did not err in holding Cullinan solely responsible for the unit.

CONCLUSION

17

¶37    In summary, we hold that substantial evidence exists to support the District Court's findings of fact.  We further hold that the District Court's conclusions of law were correct. For these reasons, we affirm.

/S/ W. WILLIAM LEAPHART


We concur:


/S/ KARLA M. GRAY
/S/ JIM REGNIER
/S/ TERRY N. TRIEWEILER
/S/ JAMES C. NELSON